# UNITED STATES GYPSUM CO. *v.* NATIONAL GYPSUM CO. ET AL.

No. 11.   Argued November 5–6, 1956.—Decided February 25, 1957.

458

*Bruce Bromley* argued the cause for appellant. With him on the brief were *Cranston Spray, Robert C. Keck* and *Hugh Lynch, Jr.*

*Samuel I. Rosenman* argued the cause for the National Gypsum Co., appellee. With him on the brief were *Elmer E. Finck, Seymour D. Lewis, Malcolm A. Hoffmann* and *Seymour Krieger.*

*Norman A. Miller* argued the cause for the Certain-Teed Products Corporation, appellee. With him on the brief were *Donald N. Clausen* and *Herbert W. Hirsh.*

*Solicitor General Rankin, Assistant Attorney General Hansen, Charles H. Weston* and *Edward Knuff* filed a memorandum for the United States, appellee.

MR. JUSTICE HARLAN delivered the opinion of the Court.

United States Gypsum Company appeals from a decree of a three-judge court of the United States District Court for the District of Columbia, entered December 9, 1954. This decree modified a final decree of that court, entered May 15, 1951, against Gypsum, the appellees National Gypsum Company and Certain-teed Products Corporation, and others, in a civil antitrust proceeding instituted by the Government in 1940.[1] The modification was a provision ordering Gypsum to dismiss with prejudice four suits which it had brought in three different federal district courts against National, Certain-teed, and two other co-defendants in the antitrust proceeding, to recover compensation or damages for the *pendente lite* use of certain of its patents during the period February 1, 1948, to May 15, 1951.[2]

At the outset some mention of the prolonged antitrust proceeding is required to put the present post-decree controversy in context. In that proceeding the Government charged Gypsum, National, Certain-teed, and a number

[1] Throughout this opinion United States Gypsum Company will be referred to as "Gypsum," National Gypsum Company as "National," and Certain-teed Products Corporation as "Certain-teed."

[2] The suits against National and Certain-teed were brought in the Northern District of Iowa. The other two suits were brought in the District of New Jersey, against Newark Plaster Company, and in the Southern District of New York, against Ebsary Gypsum Company. These latter suits have been settled and are not before us.

of other corporate and individual defendants with conspiracy to restrain and monopolize interstate commerce in gypsum board and other gypsum products in violation of §§ 1, 2 and 3 of the Sherman Act.[3] The crux of the Government's charges was the alleged illegality of Gypsum's system of industry-wide uniform patent licensing agreements containing clauses giving Gypsum the right to fix prices on gypsum board and products. In 1946, at the close of the Government's case, the District Court dismissed the complaint.[4] On appeal this Court, on March 8, 1948, reversed and remanded the case for further proceedings.[5] Thereafter the District Court, with one dissent,[6] interpreting this Court's decision to mean that Gypsum's multiple uniform price fixing patent licenses were illegal *per se* under the antitrust laws, granted the Government's motion for summary judgment, accepting as true the defendants' proffer of proof. On November 7, 1949, the District Court entered a decree which, among other things, adjudged Gypsum's patent licensing agreements illegal, null and void, enjoined the performance of such agreements, provided for limited compulsory nonexclusive licensing of Gypsum's patents on a reasonable royalty basis, and reserved jurisdiction over the case and parties for certain purposes. On appeals by both the Government and Gypsum, this Court, in 1950, dismissed Gypsum's appeal,[7] affirmed the summary judgment below,[8] and held the Government entitled to broader relief in

---

[3] 26 Stat. 209 (1890), as amended, 15 U. S. C. §§ 1–3.

[4] 67 F. Supp. 397.

[5] 333 U. S. 364.

[6] The opinion of the court, and the dissenting opinion of the late Judge Stephens, are not officially reported. They appear at pp. 137–140, 478, of the record on this appeal.

[7] 339 U. S. 959.

[8] 339 U. S. 960.

certain respects, remanding the case for that purpose.[9] Meanwhile, in noting probable jurisdiction on the Government's appeal, this Court enjoined the defendants from carrying out the price fixing provisions of their current license agreements, and from entering into any agreements or engaging in concerted action in restraint of trade.[10] This preliminary injunction, entered May 29, 1950, remained in force until the new final decree of the District Court was entered on May 15, 1951.[11]

After this Court's 1948 reversal of the District Court's original order of dismissal, National, Certain-teed, and Gypsum's other co-defendant licensees ceased paying royalties under their license agreements.[12] Following the May 15, 1951, decree, National and Certain-teed, as authorized by Article VI of that decree, entered into new license agreements, effective May 15, for the future use of Gypsum's patents, such licenses containing no price fixing clauses; the royalty rate was the same as under the old licenses, except that the licensee's returns on unpatented gypsum products did not enter into its measure. The new licenses were without prejudice to Gypsum's claim for compensation for the use of the patents during the period February 1, 1948, to May 15, 1951. The respondents not having paid for that period, Gypsum, in 1953, brought suit against them in the Iowa federal court. The complaints in these suits asserted three separate grounds for recovery: (a) the royalty provisions of the old license agreements (Counts I and II); (b) *quantum meruit* for the reasonable value of the use

[9] 340 U. S. 76.

[10] 339 U. S. 960.

[11] The significance of these various holdings as it bears upon the issues in the present controversy is dealt with later. *Infra,* pp. 468–473.

[12] In the case of National and Certain-teed the default period began with the February 1, 1948 royalties, due March 20, 1948.

of the patents (Counts III and IV); [13] and (c) damages for patent infringement (Count V).

Thereafter, National and Certain-teed, claiming that the institution of the Iowa actions violated the 1951 decree, and that in any event Gypsum was barred from recovery by reason of unpurged misuse of the patents involved, petitioned the antitrust court to enjoin further prosecution of the actions.[14]  The Government also filed a separate petition to enjoin Gypsum from maintaining any action based on the illegal license agreements, but took no position on Gypsum's right to recover for the period in question on the grounds of *quantum meruit* or patent infringement.[15]  Gypsum's answers to these petitions in substance alleged that the District Court was without jurisdiction to grant the relief sought by the petitioners, and put in issue all of the allegations on which the right to relief was predicated.

The District Court decided that it had jurisdiction to grant relief (one judge dissenting), and, after hearing the parties through briefs and oral argument, but without taking any evidence beyond that already of record in the antitrust proceeding, concluded that the 1951 decree should be modified so as to enjoin the prosecution of Gypsum's suits.[16]  The court held that prosecution of

---

[13] The lower court, regarding Count III as declaring upon a contract implied in law, described that Count as being for "indebitatus assumpsit."  The appellant says it was for "quantum meruit."  As nothing here turns on the characterization, we shall refer to both Counts III and IV as "the quantum meruit" Counts.

[14] The Iowa court, upon motions by National and Certain-teed, stayed all proceedings in the two actions pending the determination of the antitrust court now under review.

[15] The Government takes the same position in this Court.

[16] 124 F. Supp. 573.  Judge Cole dissented on the jurisdictional ground.  124 F. Supp. 598.  On December 9, 1954, the District Court denied reconsideration, Record, p. 1136; and on June 30, 1955, it denied Gypsum's motion for a new trial.  134 F. Supp. 69.

Counts I and II, which declared upon the illegal license agreements, could not be maintained under the terms of the 1951 decree. Although finding that the other three Counts were not barred by that decree, it further held that the suits should be prohibited in their entirety because of Gypsum's unpurged misuse of its patents.[17] There followed the modifying decree of December 9, 1954,[18] from which this appeal was taken. We noted probable jurisdiction. 350 U. S. 946. For the reasons given hereafter we conclude that, except as it related to the two causes of action based on the illegal license agreements (Counts I and II), this proscriptive modification of the 1951 decree was not justified by the record before the District Court.

I.

Preliminarily, we conclude that three aspects of the lower court's holding must be upheld. First, we think that Article X of the 1951 decree, reserving to the antitrust court jurisdiction, upon application of "any of the parties" to the decree, to make such "directions" and "modifications" as may be appropriate to the "carrying out" and "enforcement" of the decree, provided a fully adequate basis for the jurisdiction exercised below.[19]

---

[17] The court also held that Count III should be barred because it was "but a left-handed, indirect method for recovering such royalties." The court did not elaborate on this, but since it held that this Count was not "expressly or impliedly" covered by the 1951 decree we think this additional ground requires no separate discussion.

[18] The operative part of the decree reads as follows: "Defendant United States Gypsum Company is hereby ordered and directed to discontinue and to dismiss, with prejudice to United States Gypsum Company, its pending actions as follows: against National Gypsum Company, in the United States District Court for the Northern District of Iowa; against Certain-Teed Products Corporation, in the same District Court . . . ."

[19] Article X reads: "Jurisdiction of this cause, and of the parties hereto, is retained by the Court for the purpose of enabling any of

*United States* v. *Swift & Co.*, 286 U. S. 106, 114; *Missouri-Kansas Pipe Line Co.* v. *United States,* 312 U. S. 502. See also *Chrysler Corp.* v. *United States,* 316 U. S. 556. Gypsum argues that insofar as the relief granted below was rested upon patent misuse, instead of a construction of the 1951 decree which was the basis of enjoining the prosecution of Counts I and II of Gypsum's suits, the lower court's decision involved a determination of a collateral private controversy between this group of antitrust defendants, rather than a "carrying out" or "enforcement" of the terms of that decree. But we think that whether Gypsum was barred from recovery in these suits by reason of the abuse of its patent rights was a problem sufficiently related to the rationale of the 1951 decree to bring it within the reserved jurisdiction clause. This is especially so because patent misuse was the essence of the old antitrust litigation, and its continuance or renewal were thus issues peculiarly within the province of the antitrust court, whose determination would avoid multiple litigation and possibly conflicting decisions on that issue among the courts in which Gypsum had brought suit.

Likewise we conclude that there is no basis for disturbing the District Court's determinations that prosecution of Counts I and II, based on the old license agreements, was not permissible under the 1951 decree,[20] but that its

---

the parties to this decree, or any other person, firm or corporation that may hereafter become bound thereby in whole or in part, to apply to this Court at any time for such orders, modifications, vacations or directions as may be necessary or appropriate (1) for the construction or carrying out of this decree, and (2) for the enforcement of compliance therewith."

[20] Article IV of the 1951 decree had adjudicated as to all defendants that these license agreements were "unlawful under the antitrust laws of the United States and illegal, null and void." Article V enjoined the defendants from "performing" such agreements. Cf. *Continental Wall Paper Co.* v. *Louis Voight & Sons Co.,* 212 U. S. 227. It might be well to add that the 1951 decree would similarly

terms did not reach the *quantum meruit* and infringement Counts.[21]

The outcome of this appeal then turns on whether the District Court was right in holding as a matter of law that Gypsum was barred from any kind of recovery for the *pendente lite* use of its patents because of their unpurged misuse. It is now, of course, familiar law that the courts will not aid a patent owner who has misused his patents to recover any of their emoluments accruing during the period of misuse or thereafter until the effects of such misuse have been dissipated, or "purged" as the conventional saying goes. *Morton Salt Co.* v. *G. S. Suppiger Co.,* 314 U. S. 488; *B. B. Chemical Co.* v. *Ellis,* 314 U. S. 495; *Edward Katzinger Co.* v. *Chicago Metallic Mfg. Co.,* 329 U. S. 394; *MacGregor* v. *Westinghouse Electric & Mfg. Co.,* 329 U. S. 402; *Mercoid Corp.* v. *Minneapolis Honeywell Regulator Co.,* 320 U. S. 680. The rule is an extension of the equitable doctrine of "unclean hands" to the patent field. In terms of this case this means that Gypsum may not recover from these appellees for their use of its patents between February 1, 1948, and May 15, 1951, if Gypsum has been guilty of misuse of the patents since 1948, or if the original misuse found in the antitrust litigation remained unpurged. This issue, of course, involves essentially a question of fact. And since the record is barren of any facts with respect to the situation existing in the gypsum industry since 1941, we think that the District Court erred in holding purely as a matter of law that an unpurged misuse had been shown.

---

prevent the use of these illegal agreements as defenses by co-defendants National and Certain-teed against the *quantum meruit* and infringement Counts of Gypsum's suits.

[21] As appears, *infra,* p. 474, the Government at one time had sought to bar all such claims for recovery on the patents, but later in effect abandoned that request for relief.

## II.

Putting aside the two contract Counts, the enjoining of which we have held was sufficiently supported by the court's finding that they could not be maintained under the terms of the 1951 decree, there are three aspects to the lower court's holding as to the remaining Counts. First, the court held those Counts barred because Gypsum had engaged in "fresh" patent misuse—misuse unrelated to the original antitrust litigation. Secondly, it was held that since the "old" misuse adjudicated in the antitrust proceeding had continued unpurged, recovery must in any case be barred.[22] And finally, the court held that irrespective of purge, the "old" misuse itself was sufficient to bar the patent infringement Count. We discuss each of these holdings in turn.

### A.

The "fresh" misuse found by the lower court was simply the fact of the inclusion of Counts I and II in the 1953 suits. These Counts sought recovery of royalties under the illegal licensing agreements. Such inclusion, the court held, was a renewed attempt to enforce these illegal agreements, and as such should be regarded as a new misuse of the patents which barred recovery under the other Counts as well.[23] We do not agree.

The five Counts in Gypsum's complaints were merely alternative legal theories for reaching a single end, namely, recovery for the *pendente lite* use of Gypsum's patents. Had the complaints declared only upon the

---

[22] Counts I and II were also held barred on these grounds.

[23] We assume that if the inclusion of Counts I and II constituted a "fresh" patent misuse, the fact that they were not asserted until 1953 would make no difference in their effectiveness to bar recovery for the 1948–1951 period.

*quantum meruit* and infringement Counts the mere bringing of the suits could then hardly have been regarded as fresh misuse, even though recovery might be defeated by showing some independent unpurged misuse of the patents involved. For as the lower court recognized, such recovery by way of *quantum meruit* or damages for infringement was not "expressly or impliedly" touched by the terms of the 1951 decree. Gypsum explains the inclusion of the two contract Counts as precautionary pleading to fend against the possibility that the defendants, if sued only for *quantum meruit* and infringement, might set up the license agreements in defense.[24] Such alternative pleading is expressly sanctioned by the Federal Rules of Civil Procedure, Rule 8, and, even though that defense has turned out to be untenable in light of the lower court's findings, we think that it distorts the doctrine of patent misuse to hold that recourse to this method of pleading here vitiated the other Counts of the complaints.[25]

Moreover, in view of what transpired before the antitrust court in the hearings relating to the settlement of the 1949 decree, we are by no means satisfied that Gypsum was not entitled to a bona fide guess, at least as a matter of alternative pleading, that the decree would not be interpreted as barring the collection of these interim royalties. At those hearings counsel for one of the defendants, Celotex, without remonstrance by either of these respondents, stated:

"In order that United States Gypsum will have no misunderstanding of my position, I want them to know that my suggestion [that the decree should

---

[24] National had in fact pleaded that defense in the suit against it. But see n. 20, *supra*.

[25] In view of this conclusion it is unnecessary to deal with the contention that the lower court's holding also violated 35 U. S. C. § 271 (d).

468

declare the licenses 'illegal, null and void'] is in no sense based on any hope or desire on my part to get out of any license fees during any interim period, and if we can agree . . . as far as my client is concerned, we are willing to let the royalty rate [of the new compulsory licenses], whatever it is, agreed upon apply back to the time when we ceased paying royalties. I just want to make it clear to all that we are not attempting by this declaration of illegality of them to find some way of avoiding the license fees which during this [litigation] none of us have paid."

Further, both the Government and the other co-defendants at that time seem to have regarded the "illegal, null and void" provisions of the decree as simply the equivalent of "cancellation" of the licenses. In view of the narrow adjudication of violation by this Court, *infra*, p. 470, we cannot say that Gypsum could not have reasonably entertained the belief that the price fixing provisions of the license agreements would ultimately be held separable . from the basic undertaking to pay royalties. Indeed, the new licenses, authorized by the decree, which omitted the price fixing clauses, carried the same royalty rate on products made under the patents.

We conclude that in the circumstances present here it was error to regard the inclusion of the contract Counts as constituting a "fresh" patent misuse on Gypsum's part.

B.

We come next to the holding that the "old" misuse, found in the antitrust proceeding, continued unpurged through the 1948–1951 period. And here we are met immediately by the fact that the record before the antitrust court is completely bare of any facts relating to this period, or indeed any period after 1941. For the Government's proof in the antitrust case, presented from 1940 to . 1944, concerned the gypsum industry prior to and until

1941, and no further evidence has ever been introduced into any of these litigations. We thus know literally nothing about the state of the gypsum industry between 1948, when this Court, on evidence not extending beyond 1941, first held that there had been an antitrust violation, and 1951. How, then, can we assume that this earlier violation, adjudicated for the first time in 1948, continued thereafter?

The answer to this question depends on the nature and extent of that violation. According to Gypsum, the only illegality ever adjudicated was the fixing of prices on gypsum materials under the industry-wide uniform price fixing clauses of patent licenses which were found to have been the product of concerted action between Gypsum and its co-defendants. In other words, Gypsum, relying on the 1949 decree, which followed this Court's first decision, and its underlying findings,[26] argues that the maintenance of uniform patent licenses with price fixing clauses was the only patent misuse ever found. It then points out that it offered to prove below that price fixing in the industry stopped in 1941, and that the licenses were rescinded in 1948. Add to this the fact that the 1949 decree, and again this Court's 1950 interlocutory decree, enjoined Gypsum from enforcing these licenses, and, says Gypsum, the inference arises that the only patent misuse ever adjudicated had ceased by 1948—an inference at least sufficient to allow the issue to go to trial on the facts.

According to appellees National and Certain-teed, however, the adjudication of misuse in the antitrust proceeding was much broader, encompassing the regimentation of the entire gypsum industry, the restraint of commerce in unpatented gypsum products, the elimination of jobbers, and the standardization of trade practices through-

---

[26] See n. 6, *supra*.

out the industry. This broad view of the character of the antitrust violation rests upon this Court's 1950 decision, which held the 1949 decree too narrow and allowed the Government the broader relief embodied in the 1951 decree.[27] Appellees argue that the fact that this Court felt it necessary to broaden the 1949 decree involved by necessity an adjudication of broad patent misuse, misuse not prohibited by the 1949 decree and therefore left unpurged by it. In other words, the argument runs, the broadening of the decree by this Court necessarily involved a holding that Gypsum was guilty of violations not proscribed by the original decree, violations which existed unpurged during part or all of the 1948–1951 period, since they were first adjudicated by this Court in 1950 and presumptively continued until 1951, when they were finally dealt with by the 1951 decree.

Appellees' argument is ingenious, but incorrect. The course of decisions in the antitrust litigation clearly shows that the only misuse ever *adjudicated* was that arising from the uniform price fixing provisions of the license agreements. In the original suit the only undisputed issue of fact was that Gypsum had given its competitors uniform patent licenses containing a price fixing clause. The Government also charged Gypsum with a variety of other abuses, including price fixing on unpatented articles, elimination of jobbers, and standardization of trade practices. All of these charges were put in issue by Gypsum. On the appeal from the original dismissal of the proceedings, this Court held that the uniform price fixing licenses constituted a *per se* antitrust violation, and also that the

---

[27] 340 U. S. 76. This relief included the extension of the injunctive provisions to the entire United States (instead of merely the East) and to all gypsum products (instead of only gypsum board), compulsory licensing for an indefinite period (instead of for only 90 days), such licensing to include after-acquired (instead of only existing) patents.

Government's evidence as to the other matters constituted a *prima facie* case of additional violation.[28] On remand, the District Court, instead of going into a factual trial of these other matters, granted summary judgment on the price fixing violation. This left all of the other matters still at issue. They continued to remain at issue after the ensuing appeals to this Court, for in affirming the summary judgment [29] and broadening the 1949 decree,[30] this Court made it clear that it was proceeding solely on the basis of the narrow antitrust violation found by the District Court: [31]

> "We agree with a statement made by counsel for the Government in argument below that as a 'matter of formulating the decree' many facts offered to be proven would have effect upon the conclusion of a court as to the decree's terms. However, we read the preliminary statement of the District Court . . . as an adjudication of violation of the Sherman Act by the action in concert of the defendants through the fixed-price licenses, accepting as true the underlying facts in defendants' proof by proffer. The trial judges understood the summary judgment to be, as Judge Stephens said, 'limited to that one undisputed question.' Judge Garrett and Judge Jackson agreed. That conclusion entitled the Government only to relief based on that finding and the proffered facts. On that basis we dismissed United States Gypsum's appeal from the decree, and on that basis we examine the Government's objection to the decree.

> . . . . .

---

[28] 333 U. S. 364.

[29] 339 U. S. 960.

[30] 340 U. S. 76.

[31] As we have seen, *supra*, pp. 460–461, the Court dismissed Gypsum's appeal from the 1949 decree. 339 U. S. 959.

"[A decree] is not limited to prohibition of the proven means by which the evil was accomplished, but may range broadly through practices connected with acts actually found to be illegal. . . .

". . . We turn then to the Government's proposals for modification of the decree on the assumption that only a violation through concerted industry license agreements has been proven, but recognizing, as is conceded by defendants, that relief, to be effective, must go beyond the narrow limits of the proven violation." 340 U. S., at 87–89, 90.[32]

Thus we see that the only patent misuse that has ever been established in this long-drawn-out litigation is concerted price fixing under the former patent licenses, and that the 1950 holding of this Court was not an adjudication of other violations but only an application of the well-known principle that relief in antitrust cases may range beyond the narrow area of proven violations. Nothing, therefore, in the broadening of the decree supports the inference that the acts prohibited therein and left open in the 1949 decree continued in the *pendente lite* period or, in fact, had ever taken place. Perhaps Gypsum did engage in broad regimentation of the industry, as charged in the Government's 1940 complaint, and

---

[32] That this Court's expansion of the 1949 decree did not involve a corresponding holding of broader violation is illustrated by what was done with respect to the geographical area covered by the decree. The Government's complaint charged Gypsum with violation only in the *eastern* part of the United States. There was never any claim, much less proof, that Gypsum engaged in any improper activities in the *West*. Yet the Court granted the Government's prayer that the 1949 decree be broadened to cover the whole United States. This was done not because it was alleged or proved that Gypsum had done anything illegal in the West, but simply on the theory that effective relief required that the decree be broader than the "proven violation."

perhaps such misuse or its effects continued through 1951. But there is nothing in this record to show that any such hypothesis is true, and no part of it has ever been proved. The question is one of fact, and Gypsum is entitled to go to trial on it.

Nor is it enough to sustain the judgment below to say, as appellees do, that the conceded "old" misuse, consisting of industry-wide price fixing through uniform patent licenses, should be presumed to have continued unpurged into the 1948–1951 period. The record shows, without dispute so far, that for seven years before the beginning of the 1948–1951 period Gypsum had not engaged in price fixing, and that for two of those three years price fixing had been under injunction. These factors raised a sufficient inference of purge prior to the critical period to entitle Gypsum to go to trial on the point and to prevent the court from granting what in effect was summary judgment. Cf. *United States* v. *Oregon State Medical Society*, 343 U. S. 326. Nor do we think this conclusion is overcome by the lower court's findings that the "five acts" of purge offered by Gypsum were not sufficient to establish purge. We express no opinion upon the merits of these findings, for their sufficiency can hardly be judged in isolation from the facts as to competitive conditions in the gypsum industry during the 1941–1951 period, on which the record is silent. And other alleged antitrust violations are not now available to appellees as acts of misuse, for as to them Gypsum has not yet had its day in court.

We conclude, therefore, that the judgment below cannot be supported on the basis of the claimed unpurged "old" misuse.

## C.

We pass lastly to the lower court's holding that the "old" misuse, without regard to purge, barred the infringement Count of Gypsum's suits. In effect this holding

was that, because "of the practical and legal situation," proscription of this Count should be added by relation back, as it were, to the relief already accorded by the 1951 decree. Admittedly such relief was neither obtained nor sought by the Government in either the 1949 or 1951 decree proceedings. To be sure one of the prayers for relief in the Government's antitrust complaint in 1940 had been that the defendants should be enjoined from bringing any action for infringement of any of the patents involved or from attempting to collect in any way royalties or fees for their use until all misuse had been abandoned and its consequences dissipated. In the subsequent 1949 and 1951 decree and appellate proceedings, however, this item of proposed relief was never adverted to, much less pressed upon the courts. And even in the 1953–1954 modification proceedings, and now, the Government does not contend that Gypsum is precluded from maintaining the infringement Count. The conclusion seems inescapable that the Government's original request for such relief was in effect withdrawn. In this state of affairs we think this relief should not have been added to the decree in 1954, in the absence of proof of intervening circumstances indicating its need in the public interest. Cf. *Hughes* v. *United States,* 342 U. S. 353. There was no such proof, and without it the proscription of the infringement Count amounted to the imposition of an unwarranted penalty on Gypsum.

Nor do we think that anything in the *Hartford-Empire* cases, 323 U. S. 386, 324 U. S. 570, to which the lower court attached much weight, justifies what was done here. The basic difference between *Hartford* and this case is that in *Hartford* the injunction against infringement suits on Hartford's misused patents was part of the *original* relief granted the Government, whereas here that relief was added, without the taking of any evidence as to justifying intervening circumstances, some five years after the orig-

inal decree was entered in the District Court, and three years after its enlargement pursuant to the 1950 decision of this Court,[33] which made no mention of this type of relief.

Moreover, the factors justifying such relief in *Hartford* were quite different from those involved here, in that the litigated findings of fact as to Hartford's violation of the antitrust laws were much broader than anything found here. See *supra,* p. 470. Beyond this, in *Hartford* only infringement suits against nondefendants were enjoined, and not, as here, suits against co-defendants; and despite the breadth of Hartford's violations, this Court held that Hartford was entitled to *quantum meruit* compensation for the *pendente lite* use of its patents unless *further* violations of the antitrust laws during that period were shown. No such violations on Gypsum's part were shown or claimed by the Government or appellees, except for the inclusion of the contract Counts in Gypsum's suits, a contention which has already been met. And although the Court in *Hartford* struck down royalty-free compulsory licensing as part of the relief, the District Court here in effect held these appellees entitled to three years' free use of Gypsum's patents. We thus find no parallel between this case and *Hartford*.[34]

---

[33] 340 U. S. 76.

[34] National makes a further contention as to the *quantum meruit* Counts. It argues that these Counts in any event were properly proscribed because they related to an illegal transaction. But the rule on which National relies applies only where the *quantum meruit* claim declares upon an implied agreement which, had it been reduced to an express contract, would itself have been illegal; that is, a contract where the kind of consideration moving between the parties is wholly against public policy, as, for example, a contract to commit murder. The implied contract here was not of that character, for certainly an express contract simply for reasonable compensation for the use of Gypsum's patents would not have been illegal.

Our conclusions then are these: The enjoining of Counts I and II of Gypsum's Iowa suits was proper, and upon remand the District Court may, by appropriate modification of the decree of May 15, 1951, or otherwise, require Gypsum to discontinue and dismiss such Counts with prejudice. The enjoining of Counts III, IV and V of those suits was not justified upon this record, and as to them the case should be remanded to the District Court for the taking of evidence upon the issues of misuse and purge as they may relate to the period since February 1, 1948. We think it appropriate that these issues should be tried and disposed of by the antitrust court rather than the Iowa court, both because of reasons already given, *supra*, pp. 463–464, and because of the antitrust court's familiarity with what has occurred in these protracted litigations.[35] However, should the antitrust court conclude that Gypsum is not barred fom recovery on Counts III, IV or V by reason of unpurged patent misuse, we think that the trial and disposition of all other issues, including any defense of patent invalidity, should then take place in the District Courts in which the two suits are pending. There is no reason why the three-judge court should be burdened with such issues.

Accordingly, we reverse the judgment below and remand the case to the District Court for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

Mr. Justice Clark took no part in the consideration or decision of this case.

---

[35] We recognize that the composition of the three-judge court has completely changed since the main antitrust case was tried. Even so, the present court has acquired an intimate knowledge of the record.

Mr. Justice Black, with whom The Chief Justice and Mr. Justice Douglas join, dissenting.

I would affirm the judgment of the United States District Court.

For many years appellees used patents belonging to the appellant, United States Gypsum Company, under certain license agreements. On March 8, 1948, this Court decided that on the record before it these license agreements constituted a conspiracy between Gypsum and its licensees to violate the Sherman Act. 333 U. S. 364. Appellees then ceased paying royalties under their license agreement until May 15, 1951, on which date the United States District Court rendered a final decree holding the license agreements null and void. On this latter date new patent licenses were obtained from Gypsum which did not contain the illegal provisions and were not part of a conspiracy to violate the Sherman Act. This is a suit to make appellees pay for the use of Gypsum's patents during the period of February 1, 1948, to May 1951. Gypsum seeks payment in five separate counts. Counts one and two assert claims under the old outlawed license agreements. I agree with the Court's holding that Gypsum cannot recover on these counts. I also agree that the patent misuse rule which bars recovery "is an extension of the equitable doctrine of 'unclean hands' to the patent field." I disagree with the Court's holding that Gypsum is not barred from attempting to recover for the use of its patents during the period on the other three counts of "quantum meruit," "indebitatus assumpsit," and "infringement."

In declining to permit Gypsum to recover under the license agreements the Court here necessarily does so on the ground that the licenses were a part of an unlawful conspiracy to violate the Sherman Act. That conspiracy

existed as long as the illegal agreements remained in existence.[1]   And the agreements could and did continue to exist whether or not their inseparable parts,[2] such as the price-fixing provisions, were enforced from time to time. Any attempt to enforce directly or indirectly any part of the illegal agreements shows that the agreements and the conspiracy were still in existence.   The present holding clearly indicates their continuing existence during the period in question.   The majority appears to recognize this coexistence of the license agreements and the conspiracy when it bars a recovery for the use of the patents so long as the suits are for "royalties" under the contracts. But under the Court's holding persons who misuse their patents hereafter, and who could not, under our prior cases, recover compensation for patent use because of their illegal agreements, may now, in some instances, be able to recover full compensation by labeling their causes of action "indebitatus assumpsit" or "quantum meruit."   To permit a Sherman Act conspirator to recover for patent use under any label from a co-conspirator where the licensing agreement for that patent was held void as an integral part of the conspiracy runs counter to the doctrine of "unclean hands."   That doctrine rests basically on the idea that the law leaves wrong-doers where it finds them.   The Court does not do so here.   Appellant and appellees have been found guilty of an unlawful conspiracy to violate the Sherman Act.   Gypsum's patents were an essential part of that conspiracy.   But by giving its lawsuits appropriate labels it has obtained

---

[1] "It is the 'contract, combination . . . or conspiracy in restraint of trade or commerce' which § 1 of the Act strikes down, whether the concerted activity be wholly nascent or abortive on the one hand, or successful on the other."   *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, 225, n. 59.

[2] *MacGregor* v. *Westinghouse Electric & Mfg. Co.*, 329 U. S. 402, 407.

an opportunity to seek compensation for the use of tools it supplied to violate the law. I agree with the District Court that to allow recovery on these differently labeled counts "is but a left-handed, indirect method for recovering the royalties provided in the illegal license agreements." As I see it this permits "a licensor to be protected on an illegal contract merely because he chose one remedy rather than another on the same substantive issue." *Edward Katzinger Co.* v. *Chicago Metallic Mfg. Co.*, 329 U. S. 394, 399–400. I think the Court's holding seriously weakens the patent misuse doctrine and thereby makes enforcement of the Sherman Act far more difficult.[3]

---

[3] Some of the cases in which courts have utilized the doctrine to break up illegal combinations and practices are *Morton Salt Co.* v. *G. S. Suppiger Co.*, 314 U. S. 488; *B. B. Chemical Co.* v. *Ellis*, 314 U. S. 495; *United States* v. *National Lead Co.*, 332 U. S. 319; *Hartford-Empire Co.* v. *United States*, 324 U. S. 570.