**PET INCORPORATED, Plaintiff and Counterclaim Defendant,**

v.

**KYSOR INDUSTRIAL CORPORATION, Defendant and Counterclaim Plaintiff.**

No. G–252–71 CA.

United States District Court, W. D. Michigan, S. D.

April 28, 1975.

Peter Armstrong, Grand Rapids, Mich., Richard G. Heywood, Byron Roche, St. Louis, Mo., for plaintiff and counterclaim defendant.

Richard C. Cooper, Grand Rapids, Mich., Dirks B. Foster, Raymond L. Hanson, San Francisco, Cal., for defendant and counterclaim plaintiff.

## OPINION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

MILES, District Judge.

Plaintiff, Pet Incorporated ("Pet"), instituted this action on October 8, 1971 seeking a declaratory judgment that seven patents owned by or licensed to defendant, Kysor Industrial Corporation ("Kysor"), were invalid, unenforceable and not infringed by reason of Pet's manufacture of two open-front refrigerated display cases known as the Models J–456 and J–345. Kysor and its licensor, Dualjet Corporation ("Dualjet"), counterclaimed charging Pet with infringing the seven patents included in Pet's complaint plus three additional patents owned by Kysor. Under the reply to the second amended counterclaim, Pet raised as a defense the defense of patent misuse. The essence of the alleged misuse is that Kysor's patent rights have been the basis of an agreement by which Kysor has sought to create monoply rights of far broader scope than any to which it was entitled under the patent laws.

On this basis, Pet has now moved for summary judgment seeking the dismissal of the counterclaim, contending that as a matter of law, Kysor's misuse of its patents renders them unenforceable and thus forecloses their use as a basis for its counterclaim. Kysor has responded with its own motion for summary judgment. The latter motion seeks a ruling from this Court that there has been no misuse of these patents. Before considering in more detail the arguments of the parties and the nature of the concept of patent misuse, a short history of this litigation will help put these motions in better perspective. Both parties engage in the development, manufacture and sale of open-front refrigerated display cases. The Hussman-Pet units utilized a so-called "direct" cooling system, whereby a cold air flow is directed against and across the product prior to its becoming part of the air curtain insulating the product from the outside ambient air. The Dual-Jet-Kysor units incorporated an "indirect" cooling system whereby cool air is directed through ducts in the shelves, thus cooling the product by conduction before it is formed into part of the air curtain. Each party obtained patent rights on aspects on these cooling methods and by 1965, each party had developed units which resembled those developed by the other. As a result, cross claims of patent infringement were made. These disputes were settled by the so-called "1965 Agreement."

The Agreement provides that:

"HUSSMANN agrees not to bring suit for infringement under any of the HUSSMANN patent rights against DUAL JET, or any of its subsidiaries, licensees or sublicensees, for the manufacture, use or sale of any DUAL JET unit embodying any of the HUSSMANN patent rights, but only insofar as they are embodied in the DUAL JET unit. This paragraph is not to be construed as granting DUAL JET, its licensees or sublicensees, any right or license under the HUSSMANN patent rights.

### III. COVENANTS OF DUAL JET

DUAL JET agrees not to bring suit for infringement under any of the DUAL JET patent rights against HUSSMANN or any of its subsidiaries, licensees or sublicensees, for the manufacture, use or sale of any HUSSMANN unit, embodying any of the DUAL JET patent rights, but only insofar as they are embodied in the HUSSMANN unit. This paragraph is not to be construed as granting HUSSMANN, its subsidiaries, licensees or sublicensees, any right or license under the DUAL JET patent rights.

Speaking in terms of the basic features of each unit, the parties were also able to define the scope of the respective patent rights involved in the 1965 Agreement:

*HUSSMANN unit:* As used herein, the term "HUSSMANN unit" shall mean low temperature upright refrigerated display cabinets in which the main refrigation system shall include air distribution means for circulating a substantial portion of low temperature air into and through the product area and in direct contact with the product therein for cooling the product, and to discharge the remaining portion of low temperature air into an air curtain across the open front of said cabinet.

Since it is difficult to ascribe an exact percentage with respect to the "substantial portion" of low temperature air circulated into and through the product area according to the foregoing definition of "HUSSMANN unit", it is understood and agreed that the salient characteristic of the HUSSMANN unit is the positive circulation of low temperature air through the product area for direct and controlled cooling of products by intentional engineering design and manufacture to provide this salient characteristic.

*DUAL JET unit:* As used herein, the term "DUAL JET unit" shall mean low temperature upright refrigerated display cabinets in which the main refrigeration system shall include air distribution means for circulating substantially all low temperature air around the product area in a duct having only conductive heat exchange therewith for indirect cooling of the product and to discharge substantially all low temperature air from said duct into an air curtain across the open front of said cabinet.

Since it is difficult to ascribe an exact percentage with respect to "substantially all" low temperature air discharged into the air curtain across the open front according to the foregoing definition of "DUAL JET unit", it is understood and agreed that the salient characteristic of the DUAL JET unit is the positive discharge of low temperature air into the air curtain for indirect cooling of products by intentional engineering design and manufacture to provide this salient characteristic . . ."

More importantly for our purposes, the parties reached an apparent agreement as to the effect this Agreement was to have on their future activities with respect to refrigerated display cases. It was agreed that:

HUSSMANN will not depart from its present engineering and manufacturing know-how in the direction of the DUAL JET unit utilizing essentially only indirect product cooling.

\* \* \* \* \* \*

DUAL JET will not depart from its present engineering and manufacturing know-how in the direction of the HUSSMANN unit utilizing direct and controlled product coolings.

Thereafter, Pet commenced marketing a display cabinet known as Model J 456. Kysor, charging that this unit utilized its indirect cooling method, in contravention of the 1965 Agreement, sued Pet for breach of contract in the Circuit Court for Wexford County, Michigan in June, 1971, seeking specific performance of the Agreement, and injunction restraining Pet from manufacturing units "employing the indirect method of product cooling." (pl Ex B, para A). The case was then removed to this Court and Kysor moved to remand it back to the state court. This motion was denied by the then District Judge Albert Engel. Kysor appealed this ruling and it was reversed by the Sixth Circuit Court of Appeals in an opinion reported at 459 F.2d 1010. It was there held that:

"Kysor is free to file and maintain a contract action in State court which may be subject to federal patent-antitrust law defenses. These issues are for the State court to resolve. Kysor elected to assert only contract rights in State court. Pet may not, by asserting that Kysor's only valid cause of action is by way of suit for patent

infringement, convert this action into one arising under the patent laws of the United States."

Pet petitioned for *certiorari* to the United States Supreme Court, which was denied (409 U.S. 980, 93 S.Ct. 314, 34 L.Ed.2d 243 (1972). Also, during the pendency of the appeal before the Sixth Circuit, Pet filed this declaratory judgment action.

Upon remand to the Circuit Court for Wexford County, Pet filed a substitute answer alleging that the 1965 Agreement was illegal and void as a restraint of trade in violation of the Sherman Anti-trust Act, and the anti-trust laws of Michigan, MCLA 445.731 and MCLA 445.761. Pet thereupon filed a motion for summary judgment on those grounds which the Circuit Court granted. Following Michigan General Court Rules 117.2(1) and (3), the Circuit Court took the allegations of plaintiff's complaint as true for the purposes of the motion, and reading the 1965 Agreement in that light, ruled that:

"On its face, the agreement alleged can have no effect but to impair competition. It seeks to do indirectly what may be done only directly, by appropriate patent monoply; that is, exclude a competitor from utilizing a particular principle of manufacture. It is no answer to say that the parties are competing and that under the 1965 agreement both have had a share of the relevant market. But even assuming that the past effect of the agreement might have to be tested in terms of reasonableness, effect on the market, competition from others, etc., the effect that Kysor seeks to give the agreement is to avoid *future* competition from a particular product."

This decision was affirmed, *per curiam* by the Michigan Court of Appeals and was not pursued further by the parties. At this stage, Pet filed amended pleadings and its motion, both raising the defense of misuse.

Turning now to the issue of "misuse," this doctrine is characterized as an extension of the equity concept of "unclean hands," and has been considered by the courts on numerous occasions over a considerable period of time. See 7 Deller's Walker on Patents, 2d Ed. § 518. The present formulation of the doctrine comes from the case of *Morton Salt Co. v. G. S. Suppiger Co.*, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942). In reversing a Seventh Circuit holding which allowed Suppiger to maintain a suit charging patent infringement against Morton, the Court stated at pp. 491–493, 62 S.Ct. at p. 404:

"It thus appears that respondent is making use of its patent monopoly to restrain competition in the marketing of unpatented articles, salt tablets, for use with the patented machines, and is aiding in the creation of a limited monopoly in the tablets not within that granted by the patent. A patent operates to create and grant to the patentee an exclusive right to make, use and vend the particular device described and claimed in the patent. But a patent affords no immunity for a monopoly not within the grant, *Interstate Circuit v. United States*, 306 U.S. 208, 228, 230 [59 S. Ct. 467, 475, 476, 83 L.Ed. 610]; *Ethyl Gasoline Corp. v. United States*, 309 U.S. 436, 456 [60 S.Ct. 618, 625, 84 L.Ed. 852] and the use of it to suppress competition in the sale of an unpatented article may deprive the patentee of the aid of a court of equity to restrain an alleged infringement by one who is a competitor. . . .

The grant to the inventor of the special privilege of a patent monopoly carries out a public policy adopted by the Constitution and laws of the United States, 'to promote the Progress of Science and useful Arts, by securing for limited Times to . . . Inventors the exclusive Right . . .' to their 'new and useful' inventions. United States Constitution, Art. I, § 8, cl. 8; 35 U.S.C. § 31. But the pub-

lic policy which includes inventions within the granted monoply excludes from it all that is not embraced in the invention. It equally forbids the use of the patent to secure an exclusive right or limited monopoly not granted by the Patent Office and which it is contrary to public policy to grant. . . ."

"Undoubtedly 'equity does not demand that its suitors shall have led blameless lives,' *Loughran v. Loughran,* 292 U.S. 216, 229 [54 S.Ct. 684, 689, 78 L.Ed. 1219] cf. *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 241–45 [54 S.Ct. 146, 147, 78 L.Ed. 293]; but additional considerations must be taken into account where maintenance of the suit concerns the public interest as well as the private interests of suitors. Where the patent is used as a means of restraining competition with the patentee's sale of an unpatented product, the successful prosecution of an infringement suit even against one who is not a competitor in such sale is a powerful aid to the maintenance of the attempted monopoly of the unpatented article, and is thus a contributing factor in thwarting the public policy underlying the grant of the patent. Maintenance and enlargement of the attempted monopoly of the unpatented article are dependent to some extent upon persuading the public of the validity of the patent, which the infringement suit is intended to establish. Equity may rightly withhold its assistance from such a use of the patent by declining to entertain a suit for infringement, and should do so at least until it is made to appear that the improper practice has been abandoned and that the consequences of the misuse of the patent have been dissipated. *Cf. B. B. Chemical Co. v. Ellis,* [314 U.S. 495, 62 S. Ct. 406, 86 L.Ed. 367] [post, p. 495)."

A more recent summary of the doctrine appears in *Hensley Equipment Co. v. Esco Corp.,* 383 F.2d 252 (5 Cir. 1967), modified, 386 F.2d 442 (5 Cir. 1967). At pp. 260–261, the Court stated:

"One who attempts to exploit a patented invention beyond the scope of the patent monoply may be the subject of a judicially-imposed disability to enforce the patent. 'It is now * * * familiar law that the courts will not aid a patent owner who has misused his patents to recover any of their emoluments accruing during the period of misuse or thereafter until the effects of such misuse have been dissipated, or "purged" as the conventional saying goes. (citing cases). The rule is an extension of the equitable doctrine of "unclean hands" to the patent field.' *United States Gypsum Co. v. National Gypsum Co.,* 352 U.S. 457, 465, 77 S.Ct. 490, 494, 1 L.Ed.2d 465, 471 (1957). But the simplicity with which the rule may be stated is misleading. In 1955 the Attorney General's National Committee to Study the Antitrust Laws commented that 'the outer reach of the misuse doctrine has not yet been fully defined.' Eleven years later in 1966 the President's Commission on the Patent System reported that uncertainty as to the precise nature of the patent right coupled with lack of doctrinal clarity in the misuse rule has 'produced confusion in the public mind and a reluctance by patent owners and others to enter into contracts and other arrangements pertaining to patents or related licenses.'

The doctrine of misuse was developed by the Supreme Court in a series of early cases as a defense against contributory infringement. In 1942 the Court applied it in a case of direct infringement. *Morton Salt Co. v. G. S. Suppiger Co.,* 314 U.S. 488 [495], 62 S.Ct. 402 [406], 86 L.Ed. 363, [367] (1942). The rationale of the doctrine is a rejection of the concept of the patent as an absolute property right in favor of its definition as a right which must not be exercised in

a manner not consistent with the constitutionally-defined purpose for which it was conferred, i. e., to 'promote the Progress of * * * useful Arts.' . . .

Misuse of a patent in no way affects the validity of the patent itself, and once the patentee had 'purged himself' he may again enforce his patent by infringement suits. E. g., *United States Gypsum Co. v. National Gypsum Co.,* supra."

In supporting its contention that this doctrine applies to this case and requires the grant of its motion for summary judgment, Pet cites us to a series of patent infringement cases in which courts granted motions for summary judgment in situations where agreements between the parties were found to constitute misuse. A comparison of those cases with the facts of the instant case will be helpful in assessing the propriety of a finding of misuse here.

In *Berlenbach v. Anderson and Thompson Ski Co.,* 329 F.2d 782 (9th Cir. 1964) cert. den., 379 U.S. 830, 85 S.Ct. 60, 13 L.Ed.2d 39 (1964), the Court affirmed a District Court finding of use and its grant of summary judgment where a license agreement between the litigants stated:

"It is understood and agreed that during the term of this agreement, or any extension thereof, Second Party [Anderson] shall not manufacture or distribute in the United States and Canada any other safety type or automatic releasing ski binding other than that manufactured by First Party [Berlenbach]." 329 F.2d 783

The Court found that:

"In a series of cases involving the licensing of patents, the Supreme Court held that clauses which tie-in the exclusive sales of non-patented items with patented items are contrary to public policy for the reason that such tie-in agreements extend the patent monopoly beyond the scope permitted by the Constitution and the Congress." *Id.*

Similarly, in *Krampe v. Ideal Industries, Inc.,* 347 F.Supp. 1384 (N.D. Ill.1972), summary judgment was given on misuse, where the agreement read in part:

"The licensed vendor undertakes to sell no products of other manufacture which are identical with or similar to [the patented device]. He will also avoid any direct or indirect competition relative to the manufacturer. In particular, he may not act for a third party which makes or sells identical or similar products, either directly or indirectly, within or without the (licensed) territories, be it as a licensed vendor, commission vendor or representative." Id. at 1385–1386.

It was concluded that:

" . . . this provision in the Krampe-Weidling agreement is of that character which can prevent relief to a patentee in his action for patent infringement. Id.

In *Dubuit v. Harwell Enterprises, Inc.* 336 F.Supp. 1184 (W.D.N.C.1971), aff'd per curiam, 486 F.2d 131 (4 Cir. 1973), cert. den., 415 U.S. 958, 94 S.Ct. 1486, 39 L.Ed.2d 572 (1974), an agreement between two of the plaintiffs provided in part as follows:

"8.—American agrees that it will not, directly or indirectly manufacture, import or sell any equipment for direct printing on 3-dimensional objects or accessories therefor, whether patented or unpatented, other than the equipment and accessories sold to it by Dubuit under this agreement." 336 F.Supp. 1186

Here the Court found misuse and granted a motion for summary judgment by defendants, even though "they are strangers to that contract." Id.

And in *Dreier v. Mathias Klein & Sons, Inc.,* 180 U.S.P.Q. 190 (N.D.Ill. 1973), defendant's motion for judgment on the pleadings was granted. Citing *Krampe,* supra and *Morton Salt,* supra, the Court had little difficulty finding misuse, and concluded at p. 191:

"Here, plaintiffs request this Court to enforce the distributorship agreement which includes the unenforceable provision quoted above. It would be contrary to the principles of equity were I to enforce that agreement. The plaintiffs have come into court with unclean hands."

The agreement in that case provided as follows:

"1. Appointment as Distributor— The supplier hereby designates and appoints Klein as one of its distributors in the United States and Canada for the sale and distribution of its products, and Klein accepts said appointment, agrees to act as such distributor during the term of this agreement, and of any extensions or renewals hereof, upon and subject to the terms, provisions and conditions hereinafter set forth, and also agrees that during the term of this agreement will not distribute or sell any other product substantially similar in nature." Id.

A review of these cases, along with the leading *Morton Salt* case, shows that the existence in an agreement of provisions which restrain and/or suppress competition is a pivotal factor militating toward a finding of patent misuse at the summary judgment stage.

▌ A reading of the 1965 Agreement, however, does not convince the Court that this factor is present in the instant case. The clause of the Agreement which most nearly approaches a restraint is that in which the parties agree "not to depart from its present engineering and manufacturing knowhow in the direction" of the others patented unit. The wording of this clause does not prohibit either party from competing against the other for its share of the available market in these products. Indeed, this language allows either party to develop and market any new style of display case it desires, as long as that new style does not incorporate the other's patented features.

In sum, the Court does not feel that the 1965 Agreement can be a proper basis for a summary judgment based on the concept of patent misuse. When compared to the agreements quoted supra, the language of the 1965 Agreement raises neither the types nor the levels of restraint which have been held to constitute patent misuse.

[2] Pet also directs our attention to the Circuit Court opinion holding the Agreement violative of the Federal and State antitrust statutes, and contends that we are bound by that decision. From that premise, Pet concludes that we must find misuse, based on a series of federal cases dealing with misuse and violations of the antitrust laws. The Court cannot agree. As mentioned, the Circuit Court for Wexford County premises its decision on Kysor's interpretation of the Agreement which it held to be the proper interpretation for the purposes of the motion. The interpretation of the 1965 Agreement has, however, up until rather recently, been a consistent area of dispute between the parties. Until its brief in opposition to Pet's motion for summary judgment, Kysor had contended that these clauses were obligatory contractual obligations. Pet maintained that they were merely part of the definitions circumscribing the products which each party could produce without fear of a patent infringement suit. Kysor now concedes this definition, abandoning its earlier interpretation. (Brief for Kysor in Response to Pet's Brief, p. 9). This turn of events not only undercuts the usefulness of the Circuit Court decision but it also raises doubts in the Court's mind as to just what this Agreement meant to the parties, a question which the Court should not and could not approach at this stage of the case. Accordingly, Pet's Motion for summary judgment is denied.

▌ In light of this holding, it might appear that this Court should find that there has been no misuse of the patents here at issue. Indeed, the Court might be disposed to grant Kysor's motion for

summary judgment. At this pre-trial stage, however, aided by neither the parties' proposed findings and conclusions, nor their respective proofs, the Court hesitates to rule that there has been no misuse in this case. Although the 1965 Agreement does not justify a finding of misuse, it is possible that the further development of the case could reveal some other basis for misuse. For that reason, the Court does not intend to preclude the parties from pursuing this issue further if they so desire. Therefore, Kysor's motion for summary judgment is denied without prejudice to a later re-filing.

It is so ordered.