The ANSUL COMPANY, Plaintiff,

and

Daly-Herring Co., Carolina Chemical Co., Louisville Chemical Co., Food Machinery Co. and Triangle Chemical Co., Plaintiff-Intervenors,

v.

UNIROYAL, INC., Defendant.

No. 68 Civ. 2244.

United States District Court
S. D. New York.

Oct. 31, 1969.

**544**

Morgan, Finnegan, Durham & Pine, New York City, for plaintiff and plaintiff-intervenors, John A. Diaz, Warren H. Rotert, and David H. Pfeffer, New York City, of counsel.

Arthur, Dry, Kalish, Taylor & Wood, New York City, for defendant, Walter Barthold, Bert J. Lewen, Martin J. Cohen, and Steven H. Bazerman, New York City, of counsel.

MANSFIELD, District Judge.

This action arose out of Ansul's entry into the manufacture and sale, beginning in 1968, of a maleic hydrazide composition used by tobacco growers, farmers and others to inhibit certain types of plant growth. Prior thereto Uniroyal, claiming the exclusive right to make and sell the composition pursuant to U. S. Letters Patent No. 2,614,916 (the "916 patent" herein), was the sole source of supply. On May 31, 1968, Ansul sought a declaratory judgment to the effect that defendant's 916 patent was invalid because of failure to meet the requirements of patentability set forth in the Patent Act of 1952 (35 U.S.C. § 100 et seq.) and misrepresentations to the Patent Office, and that it was unenforceable because of Uniroyal's misuse. Ansul also sought a declaration that the patent was not infringed by it or its distributors and damages for Uniroyal's alleged violation of 35 U.S.C. § 292 by mismarking products purporting to be within the claims of the patent.

Uniroyal countered by instituting suits for infringement in several district courts in the southeastern states against various distributors of Ansul's maleic hydrazide ("MH" herein) products, Daly-Herring Company, Carolina Chemical Company, Louisville Chemical Company, Food Machinery Company and Triangle Chemical Company. At Ansul's instance we enjoined Uniroyal from prosecuting those suits. Recognizing Uniroyal's desire to have the controversy decided in a district with a less crowded calendar so that the validity of the patent might be resolved prior to its expiration date (October 21, 1969), we ordered Ansul to request its customers named in the suits brought by Uniroyal to intervene in this action, which resulted in intervention by some distributors, and ordered the parties to cooperate in seeking a speedy trial pursuant to Rule 57, F.R.Civ.P., and the Local Rules of this Court.

Uniroyal answered the general denials and counterclaimed for infringement of

both its 916 patent and its 2,575,954 patent (the "954 patent" herein).[1] All plaintiffs filed a joint amended complaint, which contained a second cause of action on behalf of Ansul and plaintiff-intervenors Daly-Herring and Louisville Chemical seeking treble damages for injuries caused by Uniroyal's alleged violations of §§ 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2).

In March, 1969, pursuant to Rule 42 (b), F.R.C.P., and with a view to efficient and speedy resolution of the issues raised, we separately tried the validity and infringement issues, following which we held invalid the 916 patent's claim to the MH composition itself (Claim No. 1) and upheld the validity of the method claim (Claim No. 7) for use of MH products to regulate the growth of tobacco and other plants. We also found that Claim No. 7 had been infringed by Ansul and plaintiff-intervenors' sales of Ansul's MH products for use in regulating the growth of plants. See Ansul Co. v. Uniroyal, Inc., 301 F.Supp. 273 (S.D.N.Y.1969).

Our decision left for trial (1) Ansul's contentions that Uniroyal's patent was unenforceable because of misuse of the patent and fraud on the Patent Office, (2) Ansul's claim that defendant violated 35 U.S.C. § 292 by labeling of its patented products with four patent numbers, two of which were inapplicable, and (3) the treble damage claims of Ansul, Daly-Herring and Louisville Chemical. These issues were tried during most of July and part of early August of this year. For the reasons set forth below we hold that because the patent has been misused by Uniroyal and the misuse has not been purged or dissipated, the patent is unenforceable. All other claims are dismissed.

Before turning to the issues, a summary of certain essential background facts with respect to Uniroyal's marketing of its MH products from 1960 to date is essential. The principal such product is a composition of the diethanolamine salt of MH with a wetting agent, which is sold by Uniroyal under the trade name "MH–30." "MH–30" is used by tobacco growers to prevent tobacco sucker growth and by farmers to prevent sprouting of potatoes and onions. Ninety percent of the MH–30 sold by Uniroyal has been marketed by it for the former use in the so-called "tobacco belt" in the southeastern states (North Carolina, Virginia, South Carolina, Georgia, Kentucky and Tennessee). This constitutes the major commercial use of the product, and though Uniroyal also manufactures an identical product named "SLO GRO" which is used to control the growth of grass, trees, shrubs and ivy, the important issues here, as well as most of the facts brought out on trial, involved the marketing of MH–30.

For some years prior to 1960 Uniroyal sold the chemical MH (more technically known as 6-hydroxy-3 (2H)-pyridazinone) to formulator-distributors who, pursuant to directions furnished by Uniroyal, converted the composition (a dry powder about 98% MH) into the diethanolamine salt of MH with a wetting agent[2] and sold it under Uniroyal's registered label as "MH–30." This earlier system of marketing proved unsuccessful because of widespread drastic price-cutting that developed as a result of competition between formulators, making the item so unprofitable that some refused to handle it and Uniroyal sales personnel urged that "drastic measures be taken to stop such practices of price cutting", (PX 608).

Beginning in early 1960 Uniroyal changed its marketing methods; it ceased selling technical MH to formulator-distributors and, instead, itself

---

1. The 954 patent covered a process for the manufacture of the chemical composition which is the subject of the 916 patent. The parties have reached agreement with respect to the 954 patent and it is no longer involved in this action.

2. The chemical terms discussed herein have been defined and discussed in this Court's prior opinion, Ansul Co. v. Uniroyal, Inc., 301 F.Supp. 273 (S.D.N.Y.1969).

manufactured the finished formulated composition which it thereafter sold under the trade name "MH–30" or "SLO GRO" to distributors. The latter resold the finished product to dealers who, in turn, resold it to the end user. In the case of MH–30 the end user would be the tobacco grower or farmer, whereas SLO GRO was to be sold primarily to golf courses, utility companies, cemeteries and state highway departments.

Uniroyal's primary objective in discontinuing sale of technical MH in 1960 to formulators and substituting its system of selling finished MH–30 through distributors and dealers was to gain greater control over the MH–30 market and thereby establish price stability in lieu of the rampant price-cutting that had characterized the earlier system of selling MH to formulators who had then sold the MH composition formulated by them at prices independently established by each. This earlier marketing method had amounted to a relinquishment of the potential market control inherent in Uniroyal's patent. Under the new market program by selling only the finished product Uniroyal was in a better position to control prices, since its patent entitled it to exclude all others from manufacture and sale of MH–30 for purposes of regulating plant growth. Since it was the sole source of MH–30, it would not take much influence to convince a distributor that he should maintain Uniroyal's "suggested" resale prices and, to a lesser extent, convince a dealer to do likewise. In view of Uniroyal's patent monopoly its "suggestion" would amount almost to a command, once it indicated that failure to adhere to such "suggested" resale prices might result in the distributor being cut off or having its supply reduced. No alternative source of the patented MH–30 was available from any competing suppliers. Thus by virtue of its 916 patent Uniroyal enjoyed a command position in the market.

A second but subordinate reason for adoption of the new marketing program in 1960 was to impede a campaign launched by various leading tobacco companies against the use of MH–30 on the ground that it adversely affected the chemical and physical and smoking properties of tobacco. Apparently MH–30 reduced the tobacco leaf's nicotine content, a goal now sought in view of increasing evidence of a connection between nicotine content and cancer but thought undesirable in the early 1960's. In addition, tobacco companies objected to MH–30 on the ground that it caused tobacco to pack in such a manner that cigarette manufacturers had to use more tobacco per cigarette. From 1959 until 1963 the tobacco industry supported legislation seeking to ban the use of MH–30 and threatened to boycott tobacco which had been treated with MH–30. The latter threat particularly bothered Uniroyal, for if use of the product was concentrated in any one geographical area, the tobacco companies' boycott would be more effective than if use of MH–30 were dispersed throughout the entire tobacco belt.

To counter this threat Uniroyal believed it advisable to limit and allocate the supply of MH–30 so that no more than 30% of the tobacco acreage in any one county would be treated with the chemical, and thought it imperative that the end sellers of MH–30, the dealers, be required to educate farmers in the use of the product so that no misapplications of the chemical would result in destroying a tobacco field and inhibiting the product's acceptance. To encourage this type of special-service dealer to handle and sell MH–30, Uniroyal's management realized that dealers (and distributors) holding educational meetings for the farmers must be adequately compensated. However, it feared that the price instability and low rates of return that had prevailed in the late 1950's would discourage dealers from making the extra effort needed properly to service the MH–30 users.

In launching its new marketing program in 1960 Uniroyal did not limit itself, however, to an education campaign or to restrictions upon the amount of

MH–30 that would be furnished to distributors in the tobacco belt area. In addition it sought to control the prices at which MH–30 would be sold by distributors to dealers and by dealers in turn to farmers. This was accomplished through the devices of "suggested resale prices" and restrictions as to the territory within which each distributor would be permitted to sell MH–30 and the classes of customers to whom MH–30 could be resold. These marketing devices, in turn, were implemented through various policing measures. Distributors and dealers were exhorted by Uniroyal to adhere to the suggested resale prices. Threats were made to cut off or reduce the supply of MH–30 to non-complying distributors. Some distributors were actually cut off or discontinued by Uniroyal. Others were induced to refuse to supply MH–30 to price-cutting dealers. The prices charged by distributors and dealers suspected of reducing prices below those suggested by Uniroyal were "tracked" or verified by Uniroyal representatives. Deliveries of MH–30 by distributors suspected of shipping outside of their specified territories were traced and MH–30 containers were marked with coding letters in order to facilitate the identity of violators.

Beginning when the new marketing program was initiated in 1960 and continuing thereafter through the year 1968, Uniroyal entered into annual written contracts with each of its authorized MH–30 distributors, which designated the area in which each distributor was expected to sell MH–30. Usually the area specified in the contract coincided with that in which the distributor normally marketed related products, such as fertilizers and farm equipment, but in many cases the designated area did not include portions of the distributor's normal market territory. Although the contract provided that the distributor would "purchase for sale in the area specified hereafter" (PX 601) and did not expressly exclude resale of MH–30 elsewhere, the evidence is abundantly clear that the parties intended the distributor to restrict itself to sales within the designated area. For instance, there were numerous instances where Uniroyal denied applications by distributors for permission to sell MH–30 outside of the area specified in their contracts, or to enlarge the area specified in their contracts, even though in some instances the distributor seeking permission maintained sales staffs and facilities in the territory for which permission was sought (e. g., Olin Mathieson Chemical Corp., Niagara Chemical Division of FMC, Chevron, Agway and Miller Chemical Co.). The accepted construction placed upon the written contracts is succinctly expressed in distributor Olin Mathieson's inter-office memorandum dated January 13, 1961 (PX 998B), produced for unexplained reasons from Uniroyal's own files rather than Olin Mathieson's, which stated:

"OMCC [Olin] will be allowed to sell MH–30 in the Carolinas and Virginia *only*. (We are still fighting for Georgia)." (Emphasis added)

Numerous witnesses and records establish that Uniroyal's purpose was to restrict each distributor to the territory specified in his contract. For instance, in a memorandum dated February 8, 1966 (PX 643) Thomas D. Ramsey, Uniroyal's Regional Sales Manager for District 3 (later 13), the tobacco belt area in which 90% of the sales of MH–30 were made, wrote "that the territory assignments as specified in the contracts should be upheld and observed".

Thus Uniroyal's designation of territories in contracts with distributors was not intended merely to insure that distributors would actively market MH–30 within the area specified. Such a system of restricting distributors to their specified areas and preventing sales to dealers elsewhere, would, of course, be helpful in combatting the anti-MH–30 efforts of the tobacco companies by enabling Uniroyal to avoid concentration of large amounts of MH–30 in any particular area and require each distributor to provide an educational program for

tobacco growers within the specified area. However, the same system would also enable Uniroyal to minimize the likelihood of price-cutting that could develop if some distributors shipped large amounts of MH–30 into other areas at low prices for a quick profit.

Most sales of MH–30 were made by Uniroyal to the trade during the tobacco growing season, which normally runs from April or May to September of each year. However, Uniroyal usually entered into its annual contracts with its distributors at the beginning of each calendar year. At the same time it furnished to the distributors a printed MH–30 price list showing three .prices: (1) Uniroyal's price to the distributor for each of the four package sizes of MH–30, (2) a "suggested wholesale price" (distributor's price to dealer), and (3) a "suggested retail price" (dealer's price to farmers or growers). For instance, from 1960 to 1967 Uniroyal's price to the distributor for the one-gallon container of MH–30 was $12.50, the suggested wholesale price was $15.50, and the suggested retail price $17.25 (DX AC).

From the inception of its use of these price lists Uniroyal made it clear to distributors that the word "suggested" actually meant "required," that distributors were expected to adhere to the resale prices specified in the price lists and require their dealer-customers to adhere to the retail prices, and that if they did not do so they would face serious consequences, such as discontinuance as a Uniroyal distributor when the time came for the renewal of the distributor's annual contract. Uniroyal sales representatives told MH–30 distributors in no uncertain terms that they were expected (1) to follow the pricing schedule, (2) to see that their dealers observed

the suggested retail prices in reselling MH–30 to farmers, and (3) not sell MH–30 to customers located outside of their specified territory.

Some distributors and dealers were cooperative from the outset in observing the resale prices stated in Uniroyal's suggested resale price lists, usually because they considered resale price maintenance, with its assured profit, to be in their own self interest.[3] Where a distributor balked, however, or was the subject of complaints by others that he had engaged in price-cutting or in sales outside of his specified area, he was reminded by Uniroyal's representatives that his contract would expire at the end of the current year and that if he persisted in price-cutting or in selling outside of his area, his contract would not be renewed and he would be discontinued as a distributor. In order to prevent distributors from reselling MH–30 to dealers who cut prices or otherwise refused to cooperate in implementing Uniroyal's marketing program, Uniroyal also required distributors to submit to it the names of their dealers for approval, and distributors agreed not to sell MH–30 to dealers not on Uniroyal's "approved dealers list" or who had been blacklisted, i. e., dropped from the approved list.

Hand in hand with its program of persuading or threatening distributors to adhere to the pricing and territorial restrictions, Uniroyal's sales representatives regularly visited dealers, even though it did not sell MH–30 to dealers directly, and tried to persuade each dealer that it was "to his best interest to adhere to our suggested pricing" (Adm. 129, Tr. 932–933, 945). This method of implementing Uniroyal's policy is attested to by salesmen's reports regarding visits to dealers (e. g., "policy

---

3. Since the total amount of MH–30 that can be sold for use by tobacco growers is limited by the size of the tobacco crop, the market is a relatively inelastic one, so that price reductions would not normally achieve a substantial permanent increase in the price-cutter's mar-

ket share. In a free competitve market any such price reduction would be met immediately and each distributor and jobber would fail to gain any substantial increase in his share of the market as a result of cutting price.

was carefully explained to each dealer. Some of them don't care for the idea of holding price" (PX 629); "May have to watch them [certain dealers] very closely concerning 'price policy' late in season" (PX 704); "The La-Folette dealer worried about price cutting by a competitor. * * * Need to work out a program between these two districts so that we can better control these dealers" (PX 624)).

Uniroyal's organized efforts to secure adherence on the part of dealers to its suggested MH–30 retail prices was confirmed by various dealers. For instance, J. B. Cobb, a Kentucky dealer, testified that he was importuned by three distributors and by Felton Byrd, a Uniroyal salesman, to adhere to its suggested resale price, and that when he engaged in price-cutting, he was blacklisted, with the result that he had considerable difficulty thereafter obtaining supplies of MH–30. Similar testimony was given by various other dealers, including John Caudill, David Dunnavent,

E. G. Thompson, and G. McCauley. Even after allowing for exaggeration because of bitterness resulting from having their supply of MH–30 cut off or seriously restricted, we are persuaded by their testimony, particularly since it is confirmed by other proof and memoranda from Uniroyal's own files.

Nor did Uniroyal stop at use of persuasion or threats to distributors or dealers. It actually discontinued some distributors; it took steps to prevent MH–30 from being supplied to certain dealers; and it resorted to various policing measures that proved quite effective in inducing distributors and dealers to hew to its line. Several distributors were discontinued during the period from 1960 to 1964, either because they failed to adhere to the resale price schedules furnished by Uniroyal or to limit their sales to the territory specified in their contracts.[4] These distributors then obtained some shipments, amounting to much less than their regular supply, from other MH–30 distribu-

4. In early 1960 Woolfolk Chemical Company, Ft. Valley, Ga., an MH–30 distributor, was notified by Ramsey that since it had engaged in cutting prices, it was being cut off. Thereafter Woolfolk was restricted to purchases of up to 500 gallons of MH–30 until Uniroyal would regain confidence in it (PX 734). At the end of the 1961 tobacco growing season Olin Mathieson Chemical Corporation, a Uniroyal distributor entitled to sell MH–30 in North Carolina, South Carolina and Virginia, was discontinued by Uniroyal because it had sold MH–30 to dealers below Uniroyal's suggested resale price and had made sales outside of its assigned territory. When Olin thereafter attempted to purchase MH–30 from Maxwell, another MH–30 distributor, Uniroyal salesmen persuaded Maxwell not to sell to Olin.

In December 1962 Graham Chemical Company, an MH–30 distributor authorized to sell MH–30 in parts of North Carolina and Virginia, but not in other areas of Virginia where it sold other agricultural chemicals, was cut off by Uniroyal as an MH–30 distributor for the reason that it had made sales of MH–30 below Uniroyal's suggested resale prices, including sales to dealers who were not on the approved list, such

as Smith Seed of Danville, Virginia. Uniroyal also accused it of selling MH–30 to sub-distributors, i. e., companies not directly authorized by Uniroyal to distribute MH–30. We reject defendant's contention that Graham was cut off primarily because of credit problems. The record reveals an entry made by Uniroyal's credit department on September 10, 1962, to the effect that Graham's credit was satisfactory, and the damaging evidence that Ramsey then arranged to have deleted in November 1962, just before Graham was discontinued. Furthermore, after it was discontinued in December 1962 Graham wrote a letter to Uniroyal in January 1963 offering to pay in advance for shipments. This sequence of events renders Ramsey's testimony suspect, at least on this issue. In the middle of the 1963 tobacco growing season Louisville Chemical Company, which had been a distributor of MH–30 since 1958, was discontinued by Uniroyal as a distributor because it had made sales of MH–30 to dealers who sold below Uniroyal's suggested retail price, including a dealer named Crouch, of Bethel, Kentucky, and another named Dunnavent. Despite repeated requests, Louisville was never reinstated by Uniroyal.

tors at higher prices than Uniroyal's regular price to distributors. However, many distributors refused to supply MH–30 to distributors who had been cut off by Uniroyal for fear of themselves being discontinued or terminated as MH–30 distributors. The record reveals that despite numerous requests for reinstatement, most of the distributors terminated by Uniroyal were not reinstated by Uniroyal.

Uniroyal likewise caused price-cutting dealers to be blacklisted so that its regular distributors, after being informed by Uniroyal salesmen that such dealers were not on Uniroyal's approved list, discontinued sales of MH–30 to them. As a result these dealers were limited to obtaining sporadic supplies of MH–30 from others with great difficulty and at higher prices than they would normally pay to their regular distributor. For instance, in the summer of 1962 Uniroyal salesman Felton Byrd advised Louisville Chemical that a dealer named Carroll County Tobacco Warehouse had been removed from the approved list because of its sales of MH–30 below suggested resale prices, with the result that Louisville Chemical, which had sold MH–30 to Carroll County Tobacco Warehouse, discontinued further sales to it. In the same year Byrd told F. Lee Rose, Jr., President of Louisville, not to sell MH–30 to dealer Crouch because Crouch was the worst price-cutter in that part of the country. When Louisville continued to sell to Crouch, Louisville itself was discontinued in the following year as a distributor. Daly-Herring, a distributor in North Carolina and Virginia, discontinued selling MH–30 to Smith Feed & Seed Co. of Danville, Virginia, after being advised by Uniroyal salesman Mishoe that Smith was a price-cutter. In 1964 E–Z–Flo, an MH–30 distributor, discontinued sales to dealer E. G. Thompson because Thompson had sold below suggested resale prices. Other examples of discontinuance of dealers because of price-cutting appear in the record.

The news of such cut offs of distributors and dealers was widely disseminated throughout the trade, and the effect of such striking examples of Uniroyal's ruthlessness, when coupled with all of the other circumstances designed to insure adherence to its program, was to deter price-cutting or sales outside of a distributor's specified territory.

Another policing device used by Uniroyal was the imprinting of code letters on each MH–30 container, which enabled Uniroyal to ascertain the source of MH–30 shipments that ended up in the hands of price-cutting dealers or outside of the distributor's designated territory. Such identification devices must be distinguished from so-called "control" numbers that enabled Uniroyal to trace the product in the event of a quality complaint. Although code letters might also have been used for the latter purpose, the evidence is abundantly clear that their function was detection of violations of Uniroyal's market policy. This purpose was flatly expressed in a Uniroyal memorandum dated April 14, 1960, shortly after the new marketing program was put into effect, as follows:

"This will enable the Sales Department to keep a close watch on performance of the distributor, particularly should any price cutting develop." (PX 648)

In 1962 the code letter system was updated and reissued and thereafter Uniroyal continued to use it for the purpose of identifying price-cutters. In later years the name of the distributor to whom each container was shipped was imprinted instead of a code letter on the container.

Distributors were acutely conscious of the purpose of this container-identification system used by Uniroyal, particularly since Uniroyal's representatives did not hesitate to explain it to them. As a result when a distributor, as would sometimes happen, shipped MH–30 to others who had been cut off by Uniroyal or to blacklisted dealers or buyers located outside of the distributor's territory, he would remove the identification for fear

that if Uniroyal's representatives discovered the source of the MH–30 he would then be discontinued. Indeed his fears were well founded. On occasion Uniroyal's sales representatives resorted to dramatic means of tracing such shipments, including dressing up in farmer's clothes and making purchases of MH–30 from price-cutting dealers, posing as "custom-applicators" of MH–30 interested in buying at a discount, and engaging in surveillance of trucks making MH–30 deliveries. A striking instance of the effectiveness of these tactics is found in the case of Olin Mathieson Chemical Corporation, a distributor. In August 1961 Uniroyal picked up samples of MH–30 at the store of a price-cutting dealer, Richardson Hardware Company, and through use of the identification marks on the containers confirmed that the supplier of the material had been Olin. Two months later Olin was discontinued by Uniroyal as an MH–30 dealer.

Uniroyal's marketing program, implemented by the various methods we have described, was dramatically effective in increasing and maintaining the market price of MH–30. Immediately after the program went into effect the price of MH–30 rose in 1960 and 1961, and thereafter remained stabilized at a level that yielded a substantial profit to Uniroyal and to those involved in the line of distribution. The success of the program was soon recognized by Uniroyal's marketing manager, Gerald Dennis, who reported at the end of the 1960 growing season "This program met with success only because through careful selection those distributors who participated wanted orderly marketing and price stability" (PX 780). Frank A. Hopkins, Vice President of Uniroyal and General Manager of its Chemical Division, testified that during the period from 1963 to 1968 the market price of MH–30 became rigid and stabilized, which was confirmed by others, including various distributors (e. g., W. Blanton of FCX and William Peele, of W. R. Peele Co.).

By 1963, and probably even earlier, the threats of boycotts on the part of tobacco companies and legislation outlawing use of MH–30 had subsided. Bills introduced into the North Carolina legislature had been defeated in 1961, and MH–30 became an accepted product in heavy demand by tobacco growers throughout the tobacco belt. To the extent that Uniroyal's marketing program was motivated in part by the desire to combat the boycotts and legislation, there was little, if any, need for it after 1963. Nevertheless Uniroyal continued it in full force and effect, since it had proved itself a very profitable method of doing business.

With the stabilization of resale prices at a rigid and artificial level, which had been achieved through the various measures taken by Uniroyal during the early 1960's, it became unnecessary to continue the policing activities at as vigorous a pace as had existed in earlier years. By 1964 the trade had learned its lesson. It was well aware of the unhappy consequences of any excessive outburst of price-cutting or violation of territorial or customer restrictions. Since Uniroyal, by reason of its 916 patent, had the right to exclude competition in the sale of MH–30, it remained the sole source of supply. For the average distributor or dealer, to be cut off would mean an almost certain loss of substantial profits, since he would then be forced to try to obtain MH–30 on a "bootleg" basis from others in the line of distribution, usually with difficulty and at higher prices.

Having thus achieved market stability and resale price maintenance, which minimized the necessity of further policing, some of Uniroyal's executives began to have qualms about the legality of their conduct. As early as 1962 we find a memorandum written by Ramsey, Manager of Sales in the tobacco belt, where 90% of MH–30 was sold, addressed to his superior, Otto P. Steinen, Uniroyal's commodity manager for agricultural chemicals, stating "We are in violation of restraint of trade if we specify areas. Any comment?" (PX 680). No reply appears. Two of Uniroyal's most zealous policemen, salesmen Felton Byrd and Tony Mishoe, were shifted out of the to-

bacco belt in 1962 and 1963, respectively, and replaced by N. R. Barden, and Lloyd A. Hayner. In July 1963 Frank A. Hopkins became director of marketing for the Uniroyal Chemical Division, which included MH-30. He instructed Ramsey not to interfere with the right of distributors and dealers to determine their own prices, and in 1964 he required Ramsey to read a "Businessman's Guide" to the antitrust laws and instructed him to advise Uniroyal MH-30 salesmen not to do anything about competitive pricing between distributors.

Although Ramsey testified that he carried out these instructions from his superior, and his testimony is to some extent corroborated by that of some other salesmen, they failed to eradicate the effects on the trade of Uniroyal's earlier conduct. None of the instructions were incorporated in any written directions, formal or informal, to the sales staff. Uniroyal continued up through 1968 to distribute to the trade its annual "suggested" resale prices. Furthermore it took no affirmative steps to advise the trade, including its various distributors and the dealers frequently visited by its representatives, that Uniroyal's "suggested" resale prices were not required to be followed or to have the force and effect that had come to be attached to them as a result of Uniroyal's earlier activities. Indeed, Barden, who replaced Byrd, testified that while he told his subordinates that Uniroyal could not control resale prices, he never so advised the trade; and when distributors complained to him about price-cutting on the part of others, his practice was to tell them that he "would see what he could do about it" rather than state outright that Uniroyal would do nothing. The effect was to imply that distributors were expected to adhere to Uniroyal's suggested resale prices, just as they had in the past.

We recognize that some Uniroyal sales representatives, notably John D. Carroll (since 1956 sales manager of agricultural chemicals) and John C. Williamson (since 1966 an MH-30 sales representative in the Carolinas and Virginia), were not as equivocal as Barden and advised the trade, upon receipt of complaints about price-cutting, that Uniroyal could do nothing. In view of the vigorous and ruthless price maintenance activities engaged in by Uniroyal during the period 1960 to 1964, however, we conclude that the measures taken by Uniroyal were wholly insufficient to inform the trade that Uniroyal did not expect compliance with its suggested resale prices and territorial restrictions, especially since it continued to distribute the resale price lists to the trade thereafter and to enter into annual contracts restricting each distributor's sales territory. The impression left with many distributors and dealers was that they were expected to follow Uniroyal's suggested resale prices, just as they had done in the past. An example is found in a 1966 letter from Armour, a distributor, to Ramsey, advising that Armour was not meeting "competitive situations" but was keeping its bargain to sell MH-30 in the manner Uniroyal "wants their product sold" (PX 611). Ramsey took no steps to correct this impression.

That Uniroyal did not intend to be deprived of continuing profits attributable to its earlier stabilization activities is further confirmed by the fact that notwithstanding its consciousness of the antitrust laws, it reverted from time to time during the period 1965 to 1967 to some of its earlier tactics. In February 1966, for instance, Ramsey refused to allow Chevron to sell MH-30 in Tennessee and Arkansas, stating that "the territory assignments as specified in the contracts should be upheld and observed" (PX 643; Adm. 262, 263). In October 1966 Ramsey and Hayner complained to Niagara Chemical about its sale of some MH-30 in Kentucky in violation of its agreement with Uniroyal and Niagara was refused permission to sell MH-30 in Kentucky. In 1967 American Oil Company was refused permission to sell MH-30 to a dealer in Kentucky, even though it was authorized to sell other Uniroyal products there. Agway was denied the right to sell in Aroostock County, Maine,

and in Long Island. Borden's Smith-Douglass Division was refused Kentucky, even though it marketed other chemicals there. Kerr-McGee was ousted from Georgia and Florida and was denied South Carolina, even though it distributed other chemicals there, after Arey, Uniroyal's salesman for Alabama, Georgia and Florida, received complaints from other distributors in his territory about Kerr-McGee's price-cutting. E-Z-Flo was again refused permission to sell in North Carolina. Cyrus Bias, former president of Tobacco States Chemical Co., testified that through 1967 Uniroyal sales representatives continued to discuss resale prices with him and price-cutting on the part of certain dealers. Indeed Uniroyal formally admits that during this period and continuing up through 1968 it continued to receive reports from MH–30 distributors concerning pricing practices of other distributors and those of MH–30 dealers.

As an economic matter, 100% compliance with Uniroyal's program for resale price maintenance and territorial restrictions could not be expected, since it would be too difficult to obtain perfect compliance on the part of each and every MH–30 distributor and dealer. From the outset, therefore, there were some who engaged in a limited amount of resale price competition and sales into forbidden territories or to blacklisted dealers or distributors to whom Uniroyal did not sell directly. However, perfect compliance was not required for Uniroyal to achieve general price stability, which was substantially realized by 1963. Thereafter some resale price erosion developed, but the majority of sales continued to be made at the suggested resale prices. We attach little or no weight to testimony that price cuts, discounts, or price erosion became "general" in 1967 and 1968, or that distributors paid little attention to Uniroyal's suggested resale prices during those years. Somewhat more specific percentages were furnished by other witnesses. Otha E. Herring, President of the Daly-Herring Company, for instance, testified that in 1964 approximately 15% of his sales of MH–30 were at a discount. Bias of Tobacco States testified that in 1966 there was little price-cutting in his area and that by 1967 20% to 25% of the sales of MH–30 were made at below suggested resale prices. George Simches, General Manager of the Planters Chemical Division of Thompson-Hayward, testified that in 1967 about 50% to 60% of his MH–30 sales were made at the suggested resale price. Other distributors, on the other hand, testified that they adhered to the suggested resale prices during these years. It is significant that sales at a discount or reduced price were not usually shown directly on sales invoices, but were invoiced at the Uniroyal suggested resale price, with a separate credit memo later being issued to reflect the reduction. This procedure, which lent itself to secrecy, indicates that most distributors still feared being cut off if they sold below Uniroyal's suggested resale prices.

Thus it appears that by 1967 the majority of MH–30 sales by distributors were at Uniroyal's suggested resale prices but that the percentage of sales at a discount had substantially increased. In addition, a large number of distributors were surreptitiously selling MH–30 to "sub-distributors," i. e., those not sold directly by Uniroyal. These developments, of course, were the natural consequence of Uniroyal's willingness to coast along during the period from 1965 to 1967 on the strength of its earlier price stabilization activity. Furthermore in October 1965 Hopkins issued a memorandum to the effect that Uniroyal was going to establish uniform, national standards for evaluation of distributors and that thenceforth no new distributors were to be appointed, no old distributors terminated, and no distributor's territory changed, without Hopkins' approval. However, since Uniroyal had successfully stabilized MH–30 prices and marketing methods, this directive had no drastic effect. By the time it was issued most distributors had been taught to adhere to Uniroyal's policy. Indeed the directive was soon disregarded in practice.

As we have already noted, in 1966 Chevron was refused permission to sell in Tennessee and Arkansas; and in 1967 Borden's Smith-Douglass Division was denied Kentucky, Agway lost Aroostock County, Maine and Long Island, Kerr-McGee was refused South Carolina, and E-Z-Flo was again denied North Carolina. Furthermore distributors previously cut off were refused reinstatement.

Notwithstanding its muted prolongation of its earlier program Uniroyal was faced by the end of 1967 with a greater percentage of MH-30 sales being made at competitive prices and through unauthorized channels. Faced with this deterioration in its market program, Uniroyal took steps to restore market stabilization rather. than allow competition to blossom. At the end of 1967 it increased its MH-30 prices to distributors by approximately $1.00 per gallon for the year 1968, ostensibly because of increased costs arising in part out of a long strike. At the same time it distributed suggested resale prices increasing the distributor's markup by only $.40 per gallon, thereby putting a price-profit squeeze on the distributor, which would tend to deter price-cutting. Some distributors were induced by its salesman Arey to agree to follow the suggested resale price structure before it was put into effect. As indicated previously, Uniroyal also continued to obtain information from its distributors with respect to prices being charged by dealers for MH-30.

Upon putting the new prices into effect Uniroyal addressed a letter dated January 17, 1968 to every authorized MH-30 distributor reminding them of Uniroyal's patent on MH-30 and advising that it proposed to protect its distributors by prosecuting for damages anyone who infringed or contributed to the infringement of the patent. "The MH-30 patent," said the letter, "represents more than this product's legal life" (PX 659). The purpose was to emphasize to distributors that they should adhere to Uniroyal's marketing program as embodied in its new contract and resale prices since Uniroyal, as the patentee, would be the sole source of supply for two more growing seasons.

At the same time, rather than risk further deterioration of the market through unauthorized sub-distribution, Uniroyal enlarged its list of authorized distributors to take into the fold those who had been sub-distributing MH-30 without authorization in 1967. The success of this latter move would depend, of course, on whether all distributors, including the new ones, would adhere to Uniroyal's program. As a step designed to assure such adherence, Uniroyal sponsored a meeting of all of its distributors at Myrtle Beach, S. C. in April 1968, upon the threshold of the 1968 selling season. At this meeting Carroll, Uniroyal's Sales Manager of Agricultural Chemicals, who had written the letter describing Uniroyal's intent to prosecute infringers, and Ramsey both spoke of Uniroyal's desire for "orderly marketing," which meant adherence to resale prices and market restrictions. At this meeting of distributors Ramsey provided room facilities for a private conference of all distributors which was called by some of the old-line reliables to indoctrinate the new distributors, some of whom were known as price-cutters in the sale of other agricultural products. At this conference there was discussion between distributors as to ways and means of maintaining Uniroyal's new suggested resale prices and one distributor, Simches, testified "that there was some discussion with regard to that price schedule in line with the reason for having the meeting" (Tr. 2908). Against the earlier background, the inference is inescapable that Ramsey, a veteran in Uniroyal's earlier program of securing adherence to its resale prices and territory restrictions, was well aware of the meeting's purpose and was content to foster it as a means of heading off further deterioration in the market.

As a result of Uniroyal's foregoing efforts, it succeeded initially in 1968 in reversing the price-cutting trend that had developed in 1967. As aids in carrying out the program it continued its

practice of placing the name of each authorized distributor on the containers of MH–30 shipped to the distributor, thus facilitating the tracing of shipments outside of authorized territories. Salesmen such as Rivers continued to get reports from distributors regarding the pricing policies of dealers. Regular Uniroyal resale price lists were distributed throughout the trade. In January 1968 Fasco, a distributor authorized to sell MH–30 in Georgia and North Carolina, was refused permission to resell in South Carolina even though it had salesmen in the latter state. Kerr-McGee was kept out of Georgia, Florida and Alabama, and the Smith-Douglass Division of Borden's continued to be excluded from Kentucky. In short, Uniroyal reverted to its earlier price and market stabilization tactics, although on a modified basis.

In June 1968, after fruitless negotiations with Uniroyal for a license, Ansul entered the market as a competing manufacturer and supplier of MH–30 (the composition consisting of the diethanolamine salt of MH with a wetting agent) under the trade name "Sucker Stuff." The entry of such a substantial competitor might normally have been expected to restore competition to the market place and dissipate the effect of Uniroyal's years of anti-competitive activity in the marketing of MH–30, at least after Ansul had had a reasonable opportunity to build up a substantially competitive system of distribution. Immediately following Ansul's institution of the present declaratory judgment suit in this Court, however, Uniroyal obtained a temporary restraining order against a distributor, Daly-Herring, in the Eastern District of North Carolina, and instituted suits for infringement against various other distributors in the tobacco belt who had purchased Sucker Stuff from Ansul. Thus it again gave notice to the trade that it proposed vigorously to enforce its 916 patent. Notwithstanding these moves, Ansul was able to sell its products to a growing number of distributors by agreeing to indemnify them against damages that they might be required to pay Uniroyal in infringement suits threatened or instituted by it against them.

In the meantime, anticipating that with the expiration of its 916 patent in October 1969 and the entry of Ansul as a competitor, the price of MH–30 would drop and Uniroyal would lose a substantial share of the market, Uniroyal introduced a so-called "new" MH product, a potassium salt of MH, which it called "Royal MH–30," on an experimental or demonstration basis, at a price of $6.25 per gallon, as compared with the current price of $13.25 per gallon for MH–30. The very substantial reduction in price cannot be justified on the basis of differences in cost of manufacture of the two compositions. It may reasonably be inferred that Royal MH–30 was introduced to assuage the anger of those who had paid a much higher price over the previous eight years for MH–30 by creating the impression that the price reduction was not due to the imminent expiration of the patent but to the development of a better product which could be manufactured at a lower price.

Locked in the present litigation Uniroyal turned to the 1969 season with Ansul's charges of patent misuse well in mind. Apparently recognizing the vulnerability of its position, it discontinued the practice which it had followed for the period from 1960 to 1968 of sending annually a new resale price list to each distributor and entering into a signed contract with each distributor specifying the territory in which the distributor would be permitted to sell MH–30. However, it did not abandon altogether its earlier practices. Since there was no change in MH–30 prices, including suggested resale prices, for the 1969 season, salesmen simply sent out the 1968 lists including Uniroyal's "suggested" resale prices to distributors upon request. Likewise, although Uniroyal reinstated one dealer, Daly-Herring, which had been cut off in 1964, it did not reinstate various others that had been terminated in furtherance of its resale price maintenance program (e. g., Olin Mathieson). Furthermore, no af-

firmative steps have been taken by Uniroyal to inform all distributors and dealers generally or in writing that they are free to resell MH–30 where they please and at such resale prices as they wish.

In March 1969 Uniroyal also unveiled to its distributors at another Myrtle Beach meeting sponsored by it a new system for marketing MH–30, called the "7/11 Plan," under which Uniroyal granted an immediate 7% discount off its regular price to the distributor, provided the distributor committed himself to purchase the first 35% of his season's requirements from Uniroyal. In order to induce the distributor to purchase his entire season's needs from Uniroyal, the latter agreed to continue the 7% discount in effect upon additional purchases up to 70% of the distributor's needs, provided the distributor bought the additional 35% by a certain specified date. In addition Uniroyal agreed to buy back inventory on the distributor's hands at the end of the season up to 11% of the distributor's season purchases. The effect of the plan, in which practically all of Uniroyal's earlier distributors participated, has been to enable Uniroyal to some extent to perpetuate its earlier pricing practices, albeit with less command than before Ansul's entry into the market.

On June 6, 1969, we handed down our decision holding that the mixture of MH with a wetting agent (Claim No. 1 of the 916 patent) was not patentable as a product, and upholding as patentable the claim (No. 7) of the right to use such a mixture for purposes of inhibiting plant growth. Thus MH–30 was not patentable as a product. Uniroyal recognized that unless it offered reasonable and non-discriminatory licenses to manufacturers of the MH mixture who requested such licenses, it would be vulnerable to the claim that in selling MH–30 to purchasers desiring to use the product for purposes of inhibiting plant growth, it was using its Claim No. 7 unlawfully to require the purchaser-licensees to buy the unpatented product,

MH–30, from it rather than permitting them as licensees to purchase the product elsewhere. Accordingly, it purported to offer licenses under Claim 7 to those requesting such licenses. However, its offer was at a rate effectively amounting to $8.25 per gallon of MH–30 which, under its own "7/11 Plan" was offered at $12.25 per gallon in five-gallon containers. Needless to say its offer was not accepted by anyone.

The foregoing is a general summary of essential facts relating to Ansul's major contentions to the effect that Uniroyal's 916 patent cannot be enforced against Ansul because Uniroyal has misused the patent as an instrument in restraint of trade in violation of §§ 1 and 2 of the Sherman Act by fixing resale prices of MH–30 at the distributor and dealer level and restricting territorial and customer resale. Ansul also argues that the patent is unenforceable on other grounds, including failure to offer any license to use unpatented pure MH prior to June 1969 or to offer a reasonable license thereafter, fraud upon the Patent Office in obtaining the 916 patent, and misuse of the patent to engage in price discrimination in the sale of MH products in violation of the Robinson-Patman Act. In addition Daly-Herring and Louisville Chemical have sued Uniroyal for damages allegedly caused by Uniroyal's discontinuance of them as distributors of MH–30, claiming that they were discontinued because of failure to comply with Uniroyal's alleged unlawful marketing program, and Ansul sues for damages allegedly caused by Uniroyal's activities in violation of the antitrust laws and for statutory penalties under 35 U.S.C. § 292 (mismarking). Additional relevant facts with respect to these various defenses, claims and contentions appear in the separate discussion of each below.

## DISCUSSION
### ANSUL'S DEFENSES BASED ON UNIROYAL'S ALLEGED MISUSE OF THE 916 PATENT

 Ansul's various contentions of patent misuse are governed by certain

basic principles. The first of these is that a patentee's lawful monopoly "must be limited to the invention described in the claims of his patent," Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 511, 37 S.Ct. 416, 419, 61 L.Ed. 871 (1917). The rights granted to a patent holder "may be pushed to evil consequences, and therefore restrained" if the patentee attempts to go beyond the limit of the exclusive rights granted, Standard Sanitary Mfg. Co. v. United States, 226 U.S. 20, 49, 33 S.Ct. 9, 15, 57 L.Ed. 107 (1912), and if the patent is used as a tool to restrain trade in areas not within the patent's four corners, the patentee may lose his right to ask the courts to protect his lawful patent monopoly.

> "A patent operates to create and grant to the patentee an exclusive right to make, use and vend the particular device described and claimed in the patent. But a patent affords no immunity for a monopoly not within the grant [citations omitted], and the use of it to suppress competition in the sale of an unpatented article may deprive the patentee of the aid of a court of equity to restrain an alleged infringement by one who is a competitor. * * *

> "It is a principle of general application that courts, and especially courts of equity, may appropriately withhold their aid where the plaintiff is using the right asserted contrary to the public interest." Morton Salt Co. v. Suppiger Co., 314 U.S. 488, 491–492, 62 S.Ct. 402, 404–405, 86 L.Ed. 363 (1942).

 Such is the doctrine of patent misuse, a doctrine that has been characterized as "an extension of the equitable doctrine of 'unclean hands' to the patent field." United States Gypsum Co. v. National Gypsum Co., 352 U.S. 457, 465, 77 S.Ct. 490, 495, 1 L.Ed.2d 465 (1957). As it is an equitable doctrine its application is not limited to any particular type of antitrust violation. It has been said "that in whatever posture the

issue may be tendered courts of equity will withhold relief where the patentee and those claiming under him are using the patent privilege contrary to the public interest." Mercoid Corp. v. Mid-Continent Inv. Co., 320 U.S. 661, 669, 64 S.Ct. 268, 273, 88 L.Ed. 376 (1944). The doctrine has primarily been invoked in cases where the patent has been used to expand the patentee's monopoly through licenses amounting to tying arrangements (requiring purchase of unpatented goods for use with the patented goods), licenses prohibiting the licensee from dealing in competitive articles, and coercive package licenses (conditioning the grant upon acceptance of licenses under other patents), Valmont Industries, Inc. v. Yuma Mfg. Co., 296 F.Supp. 1291, 1295 (D.Colo.1969). However, the doctrine applies with equal force to use of the patent as a vehicle for price fixing or imposition of other restrictions upon resale of the patented product. United States Gypsum Co. v. National Gypsum Co., 352 U.S. 457, 472, 77 S.Ct. 490, 1 L.Ed.2d 465 (1957); Hensley Equip. Co. v. Esco Corp., 383 F.2d 252 (5th Cir. 1967); Newburgh Moire Co. v. Superior Moire Co., 237 F.2d 283 (3d Cir. 1956).

**(1) *Claims of Misuse in Violation of Sherman Act***

 Uniroyal contends that the doctrine of misuse has no application for the reason that the alleged antitrust restraints do not flow from licensing of the patent but from outright sale of the product which is the subject of the patented process. An antitrust defense, it is true, does not amount to patent misuse merely because it involves patented products or products which are the subject of a patented process. Radio Corporation of America v. Hygrade Sylvania Corp., 10 F.Supp. 879 (D.N.J.1934); see Hazeltine Research, Inc. v. Automatic Radio Mfg. Co., 77 F.Supp. 493, 498 (D.Mass.1948); affd., 176 F.2d 799 (1st Cir. 1949), affd., 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950). On the other hand, misuse does not turn on the technical nicety of whether there has been

an express or implied license of the patent allegedly misused. Application of the doctrine depends upon the more substantive test of whether "the patent itself significantly contributes" to the unlawful practice. Rpt. of the Atty. Gen.'s Committee to Study the Antitrust Laws, p. 251 (1955); see Antitrust Developments 1955–1968: A Supplement to the Rpt. of the Atty. Gen.'s Nat'l Comm. to Study the Antitrust Laws, 1955, p. 181 (1968). Where the patent plays a major role in enabling its holder unlawfully to restrain trade, public policy against abuse of the limited lawful monopoly requires that its enforcement against infringers be stayed until the effects of the restraint have been purged or dissipated.

■ Here it is undisputed that the 916 patent played an important and integral role in Uniroyal's marketing program under attack. Both Hopkins, Uniroyal's Vice President and General Manager, and Ramsey, Regional Manager in charge of the territory where 90% of Uniroyal's sales of MH–30 were made, so testified. Without the patent Uniroyal would not have been able to impose upon distributors its resale price maintenance and territorial restrictions, since the composition MH–30, in the absence of the patent, would have been available to distributors from alternative sources and Uniroyal would have been relegated to the same type of price and market competition that had existed before it initiated its "orderly market" program. The key to the success of the latter program was the 916 patent.

Even if patent misuse turned upon the presence of a licence, each sale of MH–30 constituted an implied license under Claim 7 of the 916 patent to use the product for control of plant growth. We fail to see any legally significant difference between Uniroyal's annual contracts granting to distributors the right to sell MH–30 in certain territories for use in controlling plant growth, coupled with resale price maintenance through "suggested" resale price lists, and the license

agreements declared unenforceable in Newburgh Moire Co. v. Superior Moire Co., 237 F.2d 283 (3d Cir. 1956) (requirement that licensees adhere to a "minimum price list"), in Hensley Equip. Co. v. Esco Corp., 383 F.2d 252 (5th Cir. 1967) (customer restrictions), and in Laitram Corp. v. King Crab, Inc., 244 F. Supp. 9, new trial denied, 245 F.Supp. 1019 (D.Alas.1965) (price discrimination between competing licensees). In each case, as here, the patent was the competent producing factor enabling the patentee to violate the antitrust laws.

■ Here the proof is convincing that Uniroyal's MH–30 marketing activities made possible by its 916 patent constituted *per se* violations of the Sherman Act. Although a manufacturer is permitted under some circumstances to suggest resale prices to distributors of its products, United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992, 7 A.L.R. 443 (1919), the area within which such suggestions may legitimately be made has been so circumscribed as to be characterized as a "narrow channel through which a manufacturer may pass though the facts would have to be of such Doric simplicity as to be somewhat rare in this day of complex business enterprise," George W. Warner & Co. v. Black & Decker Mfg. Co., 277 F.2d 787, 790 (2d Cir. 1960). If, above and beyond a mere unilateral announcement and a refusal to deal steps are taken with the purpose or effect of inducing distributors or dealers to adhere to suggested resale prices, the marketing arrangement constitutes a combination and conspiracy to maintain prices, which is a *per se* violation of the Sherman Act. United States v. Parke, Davis & Co., 362 U.S. 29, 44, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); FTC v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922); Simpson v. Union Oil Co., 377 U.S. 13, 17, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964). Long ago the Supreme Court in *Beech-Nut* condemned the manufacturer's use of such enforcement devices as approved dealers lists, codes to identify price-cutters, requests or insistence that distributors

comply, advance announcement that the manufacturer will refuse to sell to non-adherents, and similar devices. More recently the Court emphasized in *Parke Davis* that threats of cut offs transgress permissible bounds even though actual discontinuance of distributors does not occur; and in *Simpson* the use of annual renewable leases as coercive devices was specifically outlawed. *A fortiori* where distributors willingly cooperate in such a resale price maintenance scheme, it is a clear violation of the Sherman Act. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

▮▮▮▮ The existence of a valid patent relating to the product which is the subject of such a price fixing conspiracy does not render the patentee and its co-conspirators immune from the application of the antitrust laws. United States v. Masonite Corp., 316 U.S. 265, 277, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942). Although at one time it was indicated that the licensor might fix the price to be charged by a licensee permitted to manufacture and sell the patented product, United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926); but see United States v. Line Material Co., 333 U.S. 287, 300–303, 68 S.Ct. 550, 92 L.Ed. 701 (1948), it is now firmly established that where the patentee makes and sells a patented product or one for use pursuant to a patented process and then sells it to another (which is the case here), the patentee "is no longer free to control the price at which it may be sold either in its unfinished or finished form," United States v. Univis Lens Co., 316 U.S. 241, 250–251, 62 S.Ct. 1088, 1093, 86 L.Ed. 1408 (1942); Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 456–457, 60 S.Ct. 618, 84 L.Ed. 852 (1940).

Although there was a time when doubt existed as to whether a manufacturer could lawfully restrict its distributors to certain territories or customers, see Ford Motor Co. v. Webster's Auto Sales, Inc., 361 F.2d 874, 881 (1st Cir. 1966); CBS Business Equip. Corp. v. Underwood Corp., 240 F.Supp. 413, 426 (S.D.N.Y. 1964), any such doubts were laid to rest by the Supreme Court's 1967 decision in United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), holding that such restrictions are *per se* violations of the Sherman Act, at least where they are enforced. Janel Sales Corp. v. Lanvin Parfums, Inc., 396 F.2d 398 (2d Cir.), cert. denied, 393 U.S. 938, 89 S.Ct. 303, 21 L. Ed.2d 275 (1968). Uniroyal concedes that the holding is retroactive in its application. Moreover, even prior to *Arnold, Schwinn* such restrictions were unlawful when ancillary to an unlawful resale price maintenance program. See White Motor Co. v. United States, 372 U.S. 253, 260, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). As in the case of pricing arrangements a valid patent does not authorize the holder to impose such unlawful territorial or customer restrictions upon purchasers of the patented product. See United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 721, 64 S.Ct. 805, 88 L.Ed. 1024 (1944); Keeler v. Standard Folding Bed Co., 157 U.S. 659, 15 S. Ct. 738, 39 L.Ed. 848 (1895).

▮▮▮ The evidence in the present case makes it abundantly clear that a primary purpose of Uniroyal's territorial restrictions imposed by contract annually upon its distributors was to implement its unlawful resale price maintenance program, and that the restrictions were for the most part firmly and resolutely enforced. See Janel Sales Corp. v. Lanvin Parfums, Inc., 396 F.2d 398 (2d Cir.), cert. denied, 393 U.S. 938, 89 S.Ct. 303, 21 L.Ed.2d 275 (1968). Accordingly we find that these restrictions constituted a misuse of the 916 patent amounting to a *per se* violation of the Sherman Act. Hensley Equip. Co. v. Esco Corp., 383 F.2d 252, 264 (5th Cir. 1967).

(2) *Uniroyal's Contention that any Antitrust Misuse has been Purged*

The principal contention advanced by Uniroyal is that even assuming that its market program in 1961 to 1964 repre-

sented a misuse of its 916 patent, its right to enforce the patent was restored by the fact that it thereafter purged itself of the misuse and the effects were dissipated by the time Ansul entered the market in June 1968.

 Since the doctrine of misuse is equitable in nature, based on the public policy against allowing one who wrongfully uses a patent to enforce it during the period of misuse, it has long been recognized that upon dissipation or purge of the effects of such misuse the patentee may thereafter enforce his lawful monopoly. United States Gypsum Co. v. National Gypsum Co., 352 U.S. 457, 465, 77 S.Ct. 490, 1 L.Ed.2d 465 (1957); McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d 381, 410 (10th Cir. 1965), cert. denied, 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed.2d 851 (1966); Preformed Line Products Co. v. Fanner Mfg. Co., 328 F.2d 265, 278 (6th Cir.), cert. denied, 379 U.S. 846, 85 S.Ct. 56, 13 L.Ed.2d 51 (1964); White Cap Co. v. Owens-Illinois Glass Co., 203 F.2d 694 (6th Cir. 1953); United States v. Imperial Chemical Industries, Ltd., 105 F. Supp. 215, 224 (S.D.N.Y.1952). Furthermore, there is no time bar against such a purge. A patentee may revive enforceability of his patent by correcting a misuse after commencement of an action for infringement, B. B. Chemical Co. v. Ellis, 314 U.S. 495, 498, 62 S.Ct. 406, 86 L.Ed. 367 (1941); Preformed Line Products Co. v. Fanner Mfg. Co., supra, 328 F.2d p. 278; Printing Plate Supply Co. v. Crescent Engraving Co., 246 F.Supp. 654, 672 (W.D.Mich.1965), or even after judgment. Hensley Equip. Co. v. Esco Corp., supra.

 Once misuse of a patent has been established, however, the burden is upon the patentee to show that the misuse has ceased and its effects dissipated before he will be permitted to resume enforcement of his patent. United States Gypsum Co. v. National Gypsum Co., supra, 352 U.S. p. 465, 77 S.Ct. 490, 1 L.Ed. 2d 465; B. B. Chemical Co. v. Ellis, 314 U.S. 495, 498, 62 S.Ct. 406 (1941); Pre-

formed Line Products Co. v. Fanner Mfg. Co., 328 F.2d 265, 278–279 (6th Cir. 1964). What conduct constitutes a "purge" depends upon the nature and extent of the misuse. Where the misuse consists of the insertion of an objectionable provision in a contract, the patentee's cancellation and abandonment of the clause may be sufficient, Berlenbach v. Anderson & Thompson Ski Co., 329 F.2d 782, 785 (9th Cir. 1964); White Cap Co. v. Owens-Illinois Glass Co., 203 F.2d 694 (6th Cir. 1953), particularly where no injury resulted. See McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d 381, 408–410 (10th Cir. 1965). But where, as here, it consists of extensive and aggravated misconduct over a period of several years, which has substantially rigidified the price structure of an entire market and suppressed competition over a wide area, affirmative action may be essential effectively to dispel the consequences of the unlawful conduct. Preformed Line Products Co. v. Fanner Mfg. Co., supra, 328 F.2d p. 279. An unlawful conspiracy to maintain prices in violation of the antitrust laws is presumed to continue until some affirmative act of termination or withdrawal is shown. United States v. Consolidated Laundries Corp., 291 F.2d 563, 573 (2d Cir. 1961); Continental Baking Co. v. United States, 281 F.2d 137, 155 (6th Cir. 1960).

Here Uniroyal's misuse of the 916 patent initially consisted of flagrant and widespread *per se* violations of the Sherman Act over a period of several years, which had a pronounced impact in restraining competition in the marketing of MH–30. Uniroyal failed thereafter to take effective steps to purge its misuse or dissipate the consequences of its unlawful conduct. On the contrary, when those consequences began to diminish in 1967 and 1968 it took steps to prolong them and thus continue to reap the harvest of its price stabilization measures. Such conduct is wholly insufficient to constitute a purge.

As a result of its activities in unlawfully maintaining resale prices and re-

stricting distributors' sales territories and customers, by the fall of 1964 Uniroyal had successfully stabilized resale prices and sales territories in the MH–30 market. Having been thoroughly indoctrinated as to Uniroyal's "orderly market" program, including the necessity for adhering to its suggested resale prices, and having witnessed the dire consequences of departing in any substantial way from that program, the trade had learned its lesson. If it wanted to handle MH–30, a profitable product, it must do so on the basis urged by Uniroyal, the patentee, or else be discontinued. Once this level of understanding was reached, the unlawful system could coast along with a minimum of policing until a competitive product appeared on the horizon or Uniroyal took affirmative steps that would convince distributors that they were now free to engage in market competition without reprisal by it. The record, however, fails to reveal any such affirmative action on Uniroyal's part.

Defendant points to the fact that in 1962 and 1963 it removed salesmen Byrd and Mishoe, two of the worst offenders, from the tobacco belt; that in 1963 Hopkins, the new Director of Marketing, advised Ramsey, Regional Sales Manager, to tell the sales staff that they could not interfere with the freedom of distributors and dealers to determine their own prices, which Ramsey did. This conduct was salutary, as far as it went. The trouble is that it did not go nearly far enough, and it was accompanied by other conduct revealing that the action was at best equivocal and half-hearted. None of Hopkins' instructions were put in the form of a written communication to the staff, much less to the trade. On the contrary, Uniroyal continued annually distributing its "suggested" resale prices to the trade and entering into contracts with distributors containing the usual sales territory designations, which had always been viewed by all parties as restrictions. In the absence of a clear and unequivocal statement to distributors that resale prices and territorial restrictions were no longer to have any force and effect, their perpetuation was tantamount to indicating that Uniroyal wanted the market resale price and sales territory structure to remain stable. In this context, after Uniroyal's earlier examples of how it could bare its fangs, its suggestion amounted to a command.

Further evidence of the equivocal nature of Uniroyal's "purge" is found in the testimony of salesman Barden to the effect that during the period 1963–1967, even though he had been told that Uniroyal had no right to interfere with resale prices of distributors, he would, upon receiving complaints from the latter about price-cutting, tell them he would "see what he could do about it" and would so advise his superiors. Even though nothing *was* "going to be done" about price-cutting, such responses, in the light of a history of vigorous unlawful price stabilization, would hardly convince a distributor that he was free to use price competition without reprisal at the hands of his sole source of supply. An interesting sidelight is further provided in Barden's testimony that by 1967 Uniroyal's suggested resale prices were generally disregarded by distributors. Yet he was unable to explain why, if such was the fact, Uniroyal continued its annual distribution of resale price lists.

The failure to demonstrate a purge is further evidenced by proof that despite price deterioration in 1967 and 1968 most sales were made at the suggested prices, and that Uniroyal thereafter took affirmative steps to perpetuate its stabilization of the market, including its January 1968 reminder to the trade that it would support distributors' selling efforts by suing any infringers of its 916 patent, its increasing 1968 prices in a way that imposed a price-profit squeeze upon distributors that would tend to discourage them from cutting resale prices, its sponsorship of the April 1968 Myrtle Beach distributors' meeting at which "orderly marketing" and prices were discussed, salesman Rivers' continuation of his practice of obtaining reports from distributors on dealers' pricing practices,

its continued refusals to grant distributors' requests for enlargement of their sales territories, and its refusal to reinstate some distributors previously cut off because of failure to adhere to its resale prices or territorial restrictions. We are convinced that this pattern of conduct, rather than evidencing a purge, indicated a desire to prolong the effects of its anti-competitive conduct.

Nor did the entry of Ansul into the market in June 1968 restore competition completely to the marketplace. Although some measure of competition has emerged and the effects of Uniroyal's misconduct have been partially dissipated, the combined effects of Uniroyal's multiple suits against distributors patronizing Ansul, its adoption of the "7/11 Plan" in March 1969, and its demand for a royalty rate amounting to $8.25 per gallon of MH–30, has been to perpetuate in substantial part the unlawful restraints resulting from its past misuse of its 916 patent. Accordingly Uniroyal continued to be barred from enforcing the 916 patent, which expired on October 21, 1969.

(3) *Claim of Misuse Based on Alleged Unlawful Monopolization of Sales of an Unpatented Product*

Ansul charges that Uniroyal also misused the 916 patent by conditioning the implicit grant of licenses to use pure MH and its salts with a wetting agent in accordance with Claim 7 of the patent upon the purchase of the unpatented product, MH, from itself.

 The holder of a process or use patent which utilizes an unpatented product cannot monopolize trade in the unpatented product by failing to permit the practice of the invention by those who desire to purchase the unpatented product from the patentee's competitors. B. B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367 (1942); Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371 (1938); American Lecithin Co. v. Warfield Co., 105 F.2d 207 (7th Cir.), cert. denied, 308

U.S. 609, 60 S.Ct. 175, 84 L.Ed. 509 (1939). Such conduct constitutes misuse barring enforcement of the patent against competing sellers of the unpatented product. Ansul makes two distinct contentions with respect to the applicability of this general principle here.

 Ansul's first contention is that pure maleic hydrazide (MH), which may be used to practice Claim 7 of the 916 patent, has been an unpatented and unpatentable "ancient chemical" available in commerce, and that Uniroyal, by failing to grant licenses to use pure MH without a wetting agent for plant growth regulation, misused its patent. This contention is not borne out by the evidence. While pure MH has been successfully used in experiments to inhibit plant growth, there is not a scintilla of evidence that it was ever so used commercially. Although prior to 1960 Uniroyal did sell nearly pure or "technical grade" MH to formulators who produced MH–30, it has never sold MH without a wetting agent for such use on plants.

There is, furthermore, no evidence that anyone ever asked Uniroyal for a license to use pure MH as a plant growth regulant. The only direct evidence with respect to licensing negotiations was offered through the testimony of Ansul Vice President Norris L. Neuville, who stated that he approached Uniroyal in mid-March of 1968 to seek "a license in order to permit us to sell maleic hydrazide to the tobacco market." Although Neuville in his testimony characterized this as a license "to operate under a use claim" (Tr. 1419), he later conceded that no discussion of any particular claim or even any particular patent was involved. Moreover, the fact that the product actually marketed by Ansul contains a wetting agent is further evidence that Ansul never sought a license to sell pure MH as a plant growth regulant.

 Where there is proof of an intent to utilize a process or use patent to obtain a monopoly in an unpatented product, evidence of requests for licens-

es and rejections may not be necessary to establish misuse. B. B. Chemical Co. v. Ellis, 117 F.2d 829, 838 (1st Cir. 1941) (Magruder, C. J., concurring). The evidence in this case, however, does not establish an attempt by Uniroyal to obtain a limited monopoly in the sale of pure MH, since after 1960 it did not sell the product, but sold the patented formulation with a wetting agent.

Ansul contends that even though Uniroyal did not sell pure MH, it had a duty to advise the trade that the pure chemical could be used on plants to inhibit growth and that it would grant licenses for such use. Aside from the total lack of authority for such a proposition, it is unsupported by the fundamental principle forming the basis of the doctrine of misue, which is essentially an application of the equitable defense of unclean hands to an infringement action, United States Gypsum Co. v. National Gypsum Co., 352 U.S. 457, 465, 77 S.Ct. 490, 1 L.Ed.2d 465 (1957), when a patentee utilizes his position in a manner contrary to the public interest. Morton Salt Co. v. Suppiger Co., 314 U.S. 488, 492–493, 62 S.Ct. 402, 86 L.Ed. 363 (1942). In the absence of a showing that Uniroyal took steps to suppress sales of pure MH by others, and since the product actually marketed by Uniroyal was not the pure compound but a mixture which was subject to a patent claim, we conclude that neither the traditional concept of equity jurisdiction which requires a showing of wrongful intent or willful misconduct in order to establish unclean hands, A. H. Emery Co. v. Marcan Prods. Corp., 389 F.2d 11, 17 n. 4 (2d Cir.), cert. denied, 393 U.S. 835, 89 S.Ct. 109, 21 L.Ed.2d 106 (1968), nor broader notions of public policy require us to bar enforcement of Uniroyal's patent.

Second, Ansul contends that Uniroyal's conduct since our decision of June 6, 1969 constitutes misuse of the patent because, after the MH–30 product claim (Claim No. 1) had been adjudicated in-

valid, Uniroyal had a duty to offer licenses permitting competitors to sell the unpatented product for agricultural use. B. B. Chemical Co. v. Ellis, *supra*. Although Uniroyal has indicated a willingness to license the sale of MH chemicals for use in plant growth regulation at a royalty rate of $2.75 per pound of maleic hydrazide (about $8.25 per gallon of the formulated composition), Ansul contends that this is not a good faith offer because the royalty rate is so high that a licensee could not market the MH product in competition with Uniroyal and make any profit.

A patentee may not use its power to destroy a licensee in the marketplace by adjusting the royalty rate in a discriminatory manner. Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 515, 37 S.Ct. 416, 61 L.Ed. 871 (1917); cf. Peelers Co. v. Wendt, 260 F.Supp. 193 (W.D.Wash.1966); Laitram Corp. v. King Crab, Inc., 244 F. Supp. 9, new trial denied, 245 F.Supp. 1019 (D.Alas.1965). If the rule requiring the holder of a use patent to permit competition by issuing licenses to practice the patent with unpatented products produced by others is to have any viability, it would seem equally unlawful for such a patentee to offer licenses only upon terms that would foreclose licensee-competitors from the market. Cf. National Foam System v. Urquhart, 202 F.2d 659, 663–664 (3d Cir. 1953).

Following the analysis set forth by the Supreme Court in United States v. Univis Lens Co., 316 U.S. 241, 249–250, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942), the price paid to Uniroyal for its product includes consideration both for the material and for an "implied license" to use the material pursuant to Claim 7. If Uniroyal offers actual licenses only at a royalty higher than the consideration paid by its customers for an implied license, other sellers of the unpatented material are precluded from competing.

The evidence of record bearing on the question of the fairness of Uni-

royal's license offer, indicates that it is unreasonable and discriminatory. The price at which Uniroyal sells its MH–30 ranges from $12.25 per gallon in five-gallon containers, pursuant to an early delivery discount, to $13.50 per gallon in one-gallon cans at the regular price. Uniroyal has listed its price for pure MH for non-agricultural use at $3.20 to $4.20 per pound, depending on the number of pounds ordered (PX 953). Taking the lowest price (which requires a purchase of over 50,000 pounds), Uniroyal's own price for the amount of unformulated MH contained in a gallon of MH–30 would be $9.60.

Thus, at Uniroyal's highest price for MH–30, $13.50 per gallon, its charge for the implied license to use the product in accordance with Claim 7 of the 916 patent is at most $3.90 per gallon in contrast to the $8.25 per gallon demanded by it for an express license. Viewed another way if a competing producer of MH were to market a product like MH–30 under a license costing it $8.25 per gallon, it could realize at most $5.25 per gallon without exceeding Uniroyal's highest price of $13.50 per gallon. From this $5.25 it would have to subtract all production and formulation costs. If Uniroyal's price for pure MH is a fair price—and there is no evidence to the contrary—the $5.25 return would be wholly insufficient to cover the cost of producing and selling the competing MH composition.

We conclude, therefore, that even if Uniroyal were not barred from enforcing its patent because of misuse in violation of § 1 of the Sherman Act, it would in any event be barred for the foregoing reasons from enforcing its patent for the period from June 6, 1969 until the patent's expiration on October 21, 1969 for failure to offer to license either the agricultural use of MH chemicals or the sale of such chemicals at a rate permitting viable competition in the sale of the non-patented product.

(4) *Claim of Misuse Based on Alleged Price Discrimination Between Uniroyal's MH–30 and SLO GRO Customers*

In view of our conclusion that Uniroyal is barred by reason of its foregoing conduct from enforcing its 916 patent, we need not dwell at length upon Ansul's claim that Uniroyal has also misused the patent by charging different prices for its two products, MH–30 and SLO GRO, in violation of § 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a). The Robinson-Patman Act prohibits discriminations "in price between different purchasers of commodities of like grade and quality, * * * where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them * * *." 15 U.S.C. § 13(a).

The parties have stipulated that the two products, MH–30 and SLO GRO, are physically and chemically identical, and that Uniroyal has always sold SLO GRO and its predecessor, MH–30T, at a lower price than it has charged for MH–30. The stipulated facts thus establish the existence of a price discrimination between purchasers of commodities of like grade and quality. Federal Trade Comm'n v. Borden Co., 383 U.S. 637, 86 S.Ct. 1092, 16 L.Ed.2d 153 (1966); Perkins v. Standard Oil Co., 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969). The crucial question is whether or not the requisite injury or probability of injury to competition has been established.

Ansul contends that there is injury here at the so-called secondary line, that is, injury to competition between the "favored" purchasers of SLO GRO and the "disfavored" purchasers of MH–30. Distributors of the two products do not, however, compete for sales to the same type of ultimate user. MH–30 is used for treatment of agricultural crops,

while SLO GRO is limited to non-agricultural uses. Although it is true that some firms which distribute MH–30 compete generally with some firms which distribute SLO GRO, there is no evidence that sellers of SLO GRO have attempted to introduce the product into the agricultural market in competition with MH–30 distributors. Absent any such evidence of injury or threatened injury to competition, there is no basis for a finding of a violation of the Robinson-Patman Act.

Even though all of the elements necessary to find a violation of the Act are not present, however, we must still consider whether or not Uniroyal's conduct is sufficiently ·harmful to warrant a finding of patent misuse. See Morton Salt Co. v. Suppiger Co., 314 U.S. 488, 490, 62 S.Ct. 402, 86 L.Ed. 363 (1942); Berlenbach v. Anderson & Thompson Ski Co., 329 F.2d 782 (9th Cir. 1964). Among the factors which Ansul cites as evidence of misuse is that Uniroyal has described SLO GRO as a special formulation when in fact it is not, that Uniroyal made a successful effort to prohibit sales of SLO GRO for use on tobacco, and that Uniroyal personnel told persons in the trade that SLO GRO could not be used on tobacco, while it perpetuated price discrimination between the products.

■ Uniroyal, however, is the owner of a patent which validly claims the use of MH chemicals for plant growth regulation. If it granted express licenses to practice this patent, it could, if it chose, restrict the licenses granted to certain specified uses encompassed within the claim of its patent. See General Talking Pictures Corp. v. Western Electric Co., 304 U.S. 175, 179, 58 S.Ct. 849, 82 L.Ed. 1273, on rehearing, 305 U.S. 124, 59 S.Ct. 116, 83 L.Ed. 81 (1938); R. Nordhaus & E. Jurow, Patent-Antitrust Law 158–62, 171–74 (1961). It could,

for example, grant licenses to use the chemicals for agricultural uses and other licenses restricted to non-agricultural uses, charging a different royalty for each type of license.

■ In effect, Uniroyal's marketing practices with respect to MH–30 and SLO GRO constitute just such a permissible licensing program. Sales of these products grant an implied license to use the chemicals in the manner described on the label. See United States v. Univis Lens Co., 316 U.S. 241, 249–251, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942). A different implied license is granted with respect to each of the two products, and a different price, reflecting the distinction in permissible uses under the implied licenses, is charged.

### ANSUL'S CLAIM FOR STATUTORY PENALTIES BASED ON 35 U.S.C. § 292 (MISMARKING)

■ It has been stipulated by the parties that Uniroyal placed on labels of its MH products the numbers of four patents,[5] two of which, the 917 and 926, are inapplicable. In a *qui tam* action brought pursuant to 35 U.S.C. § 292 Ansul seeks one-half of the statutory penalty for mismarking, the other half to go to the United States under the terms of the statute, which provides in pertinent part:

"Whoever marks upon, or affixes to * * * any unpatented article, the word 'patent' or number importing that the same is patented, for the purpose of deceiving the public * * * shall be fined not more than $500 for every such offense."

■ In fact all of the Uniroyal MH products, SLO GRO, MH–30T, MH Technical and MH–30 were covered with respect to their use by Claim 7 of the 916 patent, one of the patents listed on the label.[6] They were not, therefore, "un-

---

5. These were U. S. Patents Nos. 2,575,954, 2,615,916, 2,614,917 and 2,805,926.

6. All of the products listed except for MH Technical were, furthermore, subject to

the product Claim 1 of the 916 patent until this Court's decision of June 6, 1969 holding that claim invalid. The labelling practices attacked by Ansul ceased before that date. The 954 was a

patented products," and the statute, by its terms is not applicable. French v. Foley, 11 F. 801, 805–806 (S.D.N.Y. 1882); see also Santa Anita Mfg. Corp. v. Lugash, 369 F.2d 964, 968, as modified (9th Cir. 1967). We cannot disregard the plain language of this statute which, being penal in nature, must be strictly construed, e. g., Felt, for Use of United States v. Ronson Art Metal Works, 107 F.Supp. 84 (D.Minn.1952), and, therefore, plaintiff's claim under § 292 must be dismissed.

■ Plaintiff's further contention that even if the statute is inapplicable Uniroyal's marking of its labels in the foregoing manner constituted misuse of the patent, or evidence tending to show a pattern of misuse, must be rejected. The sole responsibility for the marking of the labels rested with Uniroyal's senior research biologist, Dr. John Zukel, a patentee of the 917 and 926 patents. He testified that he placed the numbers of these patents, which relate to derivatives of MH, on the labels to inform the public of Uniroyal's entire "patent estate" with respect to MH and derivatives thereof. The demonstrated absence of any intent to deceive the public calls for dismissal of the § 292 claim, Zippo Mfg. Co. v. Rogers Imports, Inc., 216 F.Supp. 670, 700 (S.D.N.Y.1963); Victoria-Vogue v. Valcourt, Inc., 148 F. Supp. 160 (S.D.N.Y.1956), and negates any basis for a claim of misuse on grounds of "mismarking." Although the public might have been confused as to the number of patents owned by Uniroyal relating to its MH products, the products were nonetheless subject to patent protection, and anyone who read the label would be so advised. There is neither proof nor reason to believe that a potential infringer would be more deterred by four outstanding patents than by two.

## ANSUL'S CLAIM THAT THE PATENT IS UNENFORCEABLE BECAUSE OF ERRONEOUS DATA IN EXAMPLE VIII

■ Ansul's contention that Uniroyal should be barred from enforcing the 916 patent because it submitted erroneous data in Example VIII is wholly without merit. Notwithstanding Ansul's frequent characterization of the data as "false," the proof is clear that the errors were wholly inadvertent, that Uniroyal's later data was not inconsistent with that reported in Example VIII, and that promptly upon discovery of the error in January of this year Uniroyal notified the Court, and its scientists gave an entirely satisfactory explanation as to how the error had occurred.

In view of the fact that the error arose from an honest mistake and not because of any fraudulent intent or gross negligence on the part of the patentee, enforcement of the patent should not be denied. Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed. 2d 249 (1965); Baldwin-Lima-Hamilton Corp. v. Tatnall Measuring Systems Co., 169 F.Supp. 1, 21 (E.D.Pa.1958). The situation here is wholly distinguishable from cases where there was evidence of fraud on the part of the patentee. See Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944); Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945).

## TREBLE DAMAGE CLAIMS BASED ON UNIROYAL'S ANTITRUST VIOLATIONS

■ There remain for consideration the claims of Ansul, Daly-Herring and Louisville Chemical for treble damages allegedly caused by Uniroyal's violation of § 1 of the Sherman Act. Although

---

process patent covering the means of producing Uniroyal's MH products. This patent was originally involved in this ac-

tion, but the parties have settled that dispute, and Ansul has been licensed to use the Uniroyal process.

Uniroyal assumes the burden of showing that it has purged its misuse of the 916 patent, each treble damage claimant assumes the burden of establishing by a fair preponderance of the credible evidence that it was caused to suffer damages as a result of Uniroyal's antitrust misconduct. American Infra-Red Radiant Co. v. Lambert Industries, Inc., 360 F.2d 977, 996 (8th Cir.), cert. denied, 385 U.S. 920, 87 S.Ct. 233, 17 L.Ed.2d 144 (1966). Since the facts with respect to each claim differ materially from the others, each must be considered separately.

### (1) *Ansul's Claim.*

██ Although Uniroyal's conduct in violation of § 1 of the Sherman Act, including its maintenance of resale prices and its territorial and customer restrictions, unlawfully restrained trade in the marketing of MH–30, Ansul has failed to show that it suffered any damages as a result of Uniroyal's conduct. There is no proof that Ansul sought to enter the market prior to the 1968 selling season. Furthermore the evidence fails to indicate that since its entry into the market in 1968 it has been unable to sell as much "Sucker Stuff," its competing MH composition, as it could produce. Vague testimony by Ansul's sales manager for agricultural chemicals, Robert D. Shockey, to the effect that after Uniroyal obtained a temporary restraining order in 1968 against certain distributors handling Ansul's product, Ansul experienced difficulty in marketing the product is unsupported by persuasive proof. Although Shockey implied that one purchaser, Blue Chemical Company, cancelled a large order because of Uniroyal's conduct, the evidence establishes to our satisfaction that the cancellation was made without knowledge of Uniroyal's infringement suits and was unrelated to any conduct on its part.

As a result of Uniroyal's conduct Ansul was required, it is true, to indemnify its distributors as a condition to their purchasing Sucker Stuff from it. The proof indicates, however, that a suffi-

cient number of distributors were willing to market its product. In 1968, for instance, Ansul initially obtained seven distributors. By 1969 this number had greatly increased and Shockey had eight salesmen under his supervision.

██ Ansul's claim that it is entitled to treble the expenses, including legal fees, incurred by it in defending Uniroyal's suits against it and the various distributors indemnified by it, presents a somewhat more difficult problem, since we have found that these suits, together with Uniroyal's other activities (e. g., its sponsorship of the "7/11 Plan," meetings in Myrtle Beach, etc.) had the effect of perpetuating the price and market stabilization achieved through its earlier violations of § 1 of the Sherman Act, and that it has failed to sustain its burden of showing that it has purged itself of its misuse of the 916 patent. Our holding that Uniroyal failed to show dissipation of the effects of its earlier patent misuse, however, cannot be equated with a finding that the 1968 lawsuits were brought by it in furtherance of a conspiracy in violation of the Sherman Act. On the contrary, we conclude that even though the suits were one of many activities which collectively had the effect of inhibiting an effective purge of its earlier misconduct, they were instituted by it in good faith and for the purpose of resolving the issues of validity and infringement rather than with the intent or purpose of restraining trade in violation of the Sherman Act. Thus Uniroyal's suits must be distinguished from those brought in furtherance of an antitrust conspiracy, see, e. g., Dairy Foods, Inc. v. Dairy Maid Prods. Co-op., 297 F.2d 805 (7th Cir. 1961); Kobe, Inc. v. Dempsey Pump Co., 198 F.2d 416 (10th Cir.), cert. denied, 344 U.S. 837, 73 S.Ct. 46, 97 L.Ed. 651 (1952), and are similar to those in Laitram Corp. v. King Crab, Inc., 244 F.Supp. 9, 15 (D.Alas.1965), which were held not to be actionable under the antitrust laws.

Ansul's treble damage suit is accordingly dismissed for failure to establish the essential elements of such a claim by

a fair preponderance of the credible evidence.

### (2) *Daly-Herring's Claim.*

■ Daly-Herring was an authorized MH–30 distributor during the period from 1960 through 1964. In January 1965 Uniroyal's sales representatives Barden, Ramsey and Rivers, after internal company deliberations beginning in September 1964, visited Otha Herring, President, and, without stating Uniroyal's reasons, advised him that Daly-Herring would no longer be an authorized distributor. Thereupon it ceased to be an authorized MH–30 distributor until 1969, when it was reinstated.

Daly-Herring contends that it was cut off in 1965 because of its failure to adhere to Uniroyal's suggested resale prices and its sales of MH–30 in South Carolina, which was outside of the sales territory specified in its contract with Uniroyal. There was proof, including Herring's testimony, that in 1964 Daly-Herring had given discounts on 15% of its sales, using independent credit memoranda to customers for this purpose, that in 1964 it had ordered and received shipments of MH–30 to a branch opened by it in Dillon, S.C., which was not in its resale territory designated by Uniroyal, and that complaints had been made to Uniroyal by Daly-Herring's competitors about its price-cutting activities.

Uniroyal, on the other hand, stated that it terminated Daly-Herring for legitimate reasons wholly unconnected with price-cutting or violation of territorial restrictions. It offered proof to the effect that in 1964 its sales staff believed that marketing of agricultural chemicals was moving away from local distributors toward direct sales through newly established "farm-service centers" to the farmer-consumer, which would weaken the position of distributors such as Daly-Herring, and that Uniroyal should take steps to replace some of its distributors with such farm outlets. Uniroyal's salesman N. R. Barden testified that a decision was made to sell MH–30 through such outlets, Agrico and Smith-Douglass, in lieu of distribution through Daly-Herring for the reason that the latter's sales management had been weakened as the result of the retirement of its president and principal sales officer, John Daly, in the middle of 1964, and the departure of its assistant sales manager, Glenn Maxwell, at the end of 1964.

Each side points to weaknesses and inconsistencies in the proof offered by the other. For example, although Herring testified that Barden objected to his selling MH–30 in South Carolina, Barden testified that he actually solicited such sales and visited Daly-Herring's Dillon, S.C., branch, and his testimony is corroborated by his contemporaneous expense vouchers and Uniroyal invoices covering shipments of MH–30 to Daly-Herring at Dillon. Barden further testified that he was unaware of Daly-Herring's actual resale prices. Uniroyal also points to the fact that the testimony of Herring and Burks (Daly-Herring's sales manager beginning in 1965) that Daly-Herring was unable after the termination to obtain MH–30 from various distributors (Smith-Douglass, Wyatt & Crews, and others) was refuted by testimony and records of such distributors revealing substantial sales by them to Daly-Herring or (in some cases) that they would have been willing to sell MH–30 to it but were never asked.

Conflicts also appear, however, in the testimony given by Uniroyal's representatives. For instance, Barden's testimony as to Uniroyal's reasons for terminating Daly-Herring's distributorship differs from that of Ramsey, sales manager for the entire area, to the effect that it was cut off because of Uniroyal's dissatisfaction with its failure to hold a sufficient number of dealer and grower educational meetings. Barden disagrees. However, Barden also did not apparently mention to Daly-Herring anything about Uniroyal's concern regarding weaknesses in Daly-Herring's management. He simply stated in 1965 that he did not know why Daly-Herring had been terminated. The record furthermore reveals that

Daly-Herring's overall business had increased from $1.8 million in 1962 to $2.9 million in 1964, a period during which it also opened up new outlets and that during the same period its MH–30 business increased from 20,000 gallons to 47,000 gallons.

After viewing the evidence in its entirety, and determining the credibility to be accorded to the witnesses viewed by the Court and the weight to be given to the proof, we conclude that while the question is a difficult one Daly-Herring has failed to establish by a fair preponderance of the evidence that it was terminated because of Uniroyal's activities in seeking to maintain resale prices and territorial restrictions in violation of the Sherman Act. Accordingly, the claim must be dismissed.

### (3) *Louisville Chemical's Claim.*

We are persuaded by the evidence that in 1963 Louisville Chemical, an authorized MH–30 distributor since 1961, was terminated by Uniroyal because it had failed to adhere strictly to Uniroyal's suggested resale prices and it had sold MH–30 to unapproved price-cutting dealers (Carroll County Tobacco Warehouse, Cobb, Dunnavent, Crouch and McCauley) after being warned not to do so, all in violation of § 1 of the Sherman Act. Thereafter Louisville was repeatedly refused reinstatement during the period from 1964 to 1968 and although it succeeded in obtaining some supplies of MH–30 from other distributors it was unable to secure its requirements completely.

Since Louisville Chemical, however, did not commence suit until May 1968, which was more than four years after it was cut off by Uniroyal, its claim is barred by the Clayton Act's four-year statute of limitations, 15 U.S.C. § 15b, which is applicable to this suit under § 4 of the same statute, 15 U.S.C. § 15.

Section 4B of the Clayton Act provides that a claim under § 4 "shall be forever barred unless commenced within four years after the cause of action accrued." Louisville Chemical does not deny that a cause of action in its favor accrued in 1963 when Uniroyal unequivocally cut it off as an authorized MH–30 distributor. It argues, however, that the Sherman Act conspiracy was a continuing one and that further causes of action accrued in its favor when it was refused reinstatement and was unable to purchase its full requirements of MH–30. This argument must be rejected. Louisville's damages flowed from the 1963 termination, which was the last overt act causing it damages, rather than from Uniroyal's later refusals to reinstate it, which amounted to a mere continuance or resassertion of the original termination and did not give rise to new claims or toll the running of the statute. Garelick v. Goerlich's, Inc., 323 F.2d 854 (6th Cir. 1963); Molinas v. National Basketball Ass'n, 190 F.Supp. 241 (S.D.N.Y.1961) (opinion by Judge Irving R. Kaufman); Fleischer v. A. A. P., Inc., 180 F.Supp. 717 (S.D.N.Y. 1959). The situation here is identical in all pertinent respects with that in *Garelich* and *Molinas*, where the courts specifically rejected the argument that continued refusals to deal or to reinstate gave rise to new causes of action. It must also be distinguished from that where the original wrongdoer later engages in new and different acts which are the competent producing cause of separate damages not flowing from the original overt act. See Hanover Shoe, Inc. v. United Shoe Mach. Corp., 377 F. 2d 776, 794 (3d Cir. 1967).

Louisville Chemical's claim is therefore dismissed.

### CONCLUSION

For the reasons hereinabove stated, the various claims of Ansul and plaintiff-intervenors, except to the extent granted in our decision dated June 6, 1969, are dismissed, and Uniroyal's counterclaim for infringement of the 916 patent is dismissed as unenforceable because of its misuse of the patent which continued until the patent's expiration.

**570**

Since each side has prevailed on some issues, no costs shall be taxed against either side and no attorneys' fees awarded.

The foregoing shall constitute the Court's findings of fact and conclusions of law in accordance with Rule 52(a), F.R.Civ.P.

It is so ordered.